# 26-16(L)

**26-41(CON)**

*To Be Argued By*:
MIRANDA GONZALEZ

# United States Court of Appeals

**For the Second Circuit**

UNITED STATES OF AMERICA,

*Appellant,*

—against—

KARL JORDAN, JR., also known as LITTLE D, also known as NOID,

*Defendant-Appellee,*

RONALD WASHINGTON, also known as TINARD, JAY BRYANT, also known as BRADSHAW DEWITT, also known as JASON ROBINSON, also known as MORGAN BRYANT, also known as DESHAWN SADLER, also known as JAY SADLER, also known as BIG JAY,

*Defendants.*

**On Appeal From The United States District Court For The Eastern District of New York**

## BRIEF FOR THE UNITED STATES

JOSEPH NOCELLA, JR.,
*United States Attorney,*
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

AMY BUSA,
MIRANDA GONZALEZ,
MARK E. MISOREK,
*Assistant United States Attorneys,*
*Of Counsel.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iv

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF THE CASE ..... 3

I. Jordan's Criminal Charges ..... 4

II. The Trial Evidence ..... 5

A. The Relationship Between Mizell, Jordan, and Washington ..... 7

B. The Narcotics Conspiracy ..... 8

C. The Failed August 2002 Baltimore Deal With Yakim ..... 10

D. The Continuing Narcotics Conspiracy Through Mizell's Murder ..... 13

E. The October 30, 2002 Murder of Mizell ..... 17

F. Jordan and Washington's Actions After the Murder ..... 28

III. Jordan's Post-Trial Motions ..... 31

IV. The District Court's Decision ..... 32

A. The District Court Held Jordan Was a Member of the Ongoing Narcotics Conspiracy at the Time of Mizell's Murder ..... 33

B. The District Court Vacated the Jury Verdict as to Jordan, Holding that Jordan Did Not

Have a Narcotics-Related Motive to Kill Mizell, But His Co-Conspirator Did ..... 34

C. The District Court Improperly Undercut the Jury's Factfinding Role in Rejecting the Identification of Jordan as Mizell's Shooter ..... 37

SUMMARY OF ARGUMENT ..... 41

ARGUMENT ..... 43

I. Applicable Law ..... 43

A. Standard of Review ..... 43

B. Rule 29 ..... 43

C. Section 848(e)(1)(A) ..... 46

D. Section 924(j)(1) ..... 47

II. The Jury's Verdict Is Supported By The Evidence And The District Court Erred By Not Considering or Crediting Certain Evidence That Supported the Jury's Verdict ..... 48

A. The District Court Refused to Consider Trial Evidence for Jordan That It Considered For Washington ..... 49

B. The District Court Ignored the Timing and Circumstances of the Murder, Including Jordan's Role as the Shooter, in Connection with Jordan's Knowledge and Motive ..... 53

C. The District Court Gave Little Weight to the Conspiratorial Relationship and Favored Direct Evidence Over Circumstantial Evidence to Prove Jordan's Knowledge ..... 62

D. The Jury Was Not Required to Be Unanimous on Which Narcotics-Related Motive Applied or How Jordan Believed the Firearm Would Further the Conspiracy ....................... 77

E. The Trial Evidence Permitted Several Possible Narcotics-Related Motives for Jordan's Murder of Mizell, All of Which Had the Potential to Further the Narcotics Conspiracy ............................................................ 82

III. The District Court Erred When It Failed to Consider Aiding and Abetting Liability ................................ 90

CONCLUSION ............................................................................ 97

# TABLE OF AUTHORITIES

Page

## CASES

*Aller v. United States*,
646 F. App'x 21 (2d Cir. 2016) .......... 81

*Jackson v. Virginia*,
443 U.S. 307 (1979) .......... 44

*Ratzlaf v. United States*,
510 U.S. 135 (1994) .......... 65

*Richardson v. United States*,
526 U.S. 813 (1999) .......... 77, 81

*Rosemond v. United States*,
572 U.S. 65 (2014) .......... 91, 92

*Smith v. United States*,
508 U.S. 223 (1993) .......... 47, 87

*United States v. Abozid*,
257 F.3d 191 (2d Cir. 2001) .......... 94

*United States v. Aguilar*,
585 F.3d 652 (2d Cir. 2009) .......... 46, 47, 78, 79

*United States v. Anderson*,
747 F.3d 51 (2d Cir. 2014) .......... 60

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018) .......... 90 n.16

*United States v. Archer*,
977 F.3d 181 (2d Cir. 2020) .......... 91

*United States v. Arrington*,
941 F.3d 24 (2d Cir. 2019) .......... 83

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) .......... 44

*United States v. Campbell*,
850 F. App'x 102 (2d Cir. 2021) .......... passim

*United States v. Caraballo*,
658 F. App'x 595 (2d Cir. 2016) .......... 95

*United States v. Caraballo*,
No. 12-CR-105,
2014 WL 3535348 (D. Vt. July 16, 2014) .......... 95

*United States v. Carson*,
702 F.2d 351 (2d Cir. 1983) .......... 45

*United States v. Coppola*,
671 F.3d 220 (2d Cir. 2012) .......... 89, 90

*United States v. Desinor*,
525 F.3d 193 (2d Cir. 2008) .......... 47, 78, 79

*United States v. Djibo*,
850 F. App'x 52 (2d Cir. 2021) .......... 67

*United States v. Finley*,
245 F.3d 199 (2d Cir. 2001) .......... 47, 80

*United States v. Frampton*,
382 F.3d 213 (2d Cir. 2004) .......... 93

*United States v. Gadsden*,
300 F. App'x 108 (2d Cir. 2008) .......... 83

*United States v. Glenn*,
312 F.3d 58 (2d Cir. 2002) .......... passim

*United States v. Guadagna*,
183 F.3d 122 (2d Cir. 1999) .......... 43, 44

*United States v. Heinemann*,
801 F.2d 86 (2d Cir. 1986) .......... 86

*United States v. Heras*,
609 F.3d 101 (2d Cir. 2010) .......... 94

*United States v. Huezo*,
546 F.3d 174 (2d Cir. 2008) .......... 68

*United States v. Kemp*,
No. 21-1684-CR,
2023 WL 405763 (2d Cir. Jan. 26, 2023) .......... 83

*United States v. Klein*,
913 F.3d 73 (2d Cir. 2019) .......... 44, 64-65

*United States v. Lewis*,
62 F.4th 733 (2d Cir. 2023) .......... 89

*United States v. MacPherson*,
424 F.3d 183 (2d Cir. 2005) .......... 45, 90 n.16

*United States v. Mariani*,
725 F.2d 862 (2d Cir. 1984) .......... 45

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020) .......... 43

*United States v. Nina*,
734 F. App'x 27 (2d Cir. 2018) .......... 47

*United States v. O'Connor*,
650 F.3d 839 (2d Cir. 2011) .......... 61

*United States v. Panebianco*,
543 F.2d 447 (2d Cir. 1979) .......... 65-66

*United States v. Pauling*,
924 F.3d 649 (2d Cir. 2019) .......... 43

*United States v. Peterson*,
768 F.2d 64 (2d Cir. 1985) .......................................................... 95

*United States v. Pierce*,
785 F.3d 832 (2d Cir. 2015) .................................................. 71, 83

*United States v. Plitman*,
194 F.3d 59 (2d Cir. 1999) .......................................................... 62

*United States v. Prado*,
815 F.3d 93 (2d Cir. 2016) .................................................... 91, 93

*United States v. Rea*,
958 F.2d 1206 (2d Cir. 1992) ...................................................... 44

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) .......................................................... 68

*United States v. Santos*,
541 F.3d 63 (2d Cir. 2008) ..................................................... passim

*United States v. Snow*,
462 F.3d 55 (2d Cir. 2006) ............................................... 48, 60, 89

*United States v. Stanley*,
928 F.2d 575 (2d Cir.1991) ................................................ 58 n.10

*United States v. Sureff*,
15 F.3d 225 (2d Cir. 1994) .......................................................... 68

*United States v. Truman*,
688 F.3d 129 (2d Cir. 2012) ........................................................ 43

*United States v. Vernace*,
811 F.3d 609 (2d Cir. 2016) .................................................. passim

*United States v. Walker*,
142 F.3d 103 (2d Cir. 1998) .................................................. passim

*United States v. Wallace*,
447 F.3d 184 (2d Cir. 2006) ........................................................ 80

*United States v. White*,
7 F.4th 90 (2d Cir. 2021) .......................................................... 90 n.16

STATUTES

18 U.S.C. § 924(c) .......................................................... passim

18 U.S.C. § 924(j) .......................................................... passim

21 U.S.C. § 841(b)(1)(C) .......................................................... passim

21 U.S.C. § 848(e)(1)(A) .......................................................... passim

RULES

Fed. R. Crim. P. 29 .......................................................... passim

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 26-16(L), 26-41(CON)

UNITED STATES OF AMERICA,

*Appellant*,

-against-

KARL JORDAN, JR., also known as LITTLE D, also known as NOID,

*Defendant-Appellee*,

RONALD WASHINGTON, also known as TINARD, JAY BRYANT, also known as BRADSHAW DEWITT, also known as JASON ROBINSON, also known as MORGAN BRYANT, also known as DESHAWN SADLER, also known as JAY SADLER, also known as BIG JAY,

*Defendants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

# BRIEF FOR THE UNITED STATES

## JURISDICTIONAL STATEMENT

The United States of America appeals from an order entered on December 19, 2025 and a corrected order entered on January 7, 2026,

in the United States District Court for the Eastern District of New York (DeArcy Hall, J.), granting the motion of Defendant-Appellee Karl Jordan, Jr. ("Jordan") for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 related to his murder of Jason Mizell on October 30, 2002. (SPA:1-29, 53-81).[1]

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. The government filed timely notices of appeal on January 5, 2026 and January 7, 2026, respectively. (DE:326, 329). This Court has jurisdiction pursuant to 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUES

Whether the district court erred in entering a judgment of acquittal vacating the jury's verdict convicting Jordan of Count One (murder while engaged in a narcotics conspiracy) on the ground that the jury could not have found that at least one of Jordan's motives for murder was narcotics-related.

---

[1] "SPA," "A," "SA," "DE," and "GX" refer to the government's special appendix, the government's appendix, the government's sealed appendix, entries on the district court's docket, and the government's trial exhibits, respectively.

Whether the district court erred in entering a judgment of acquittal vacating the jury's verdict convicting Jordan of Count Two (firearm-related murder) on the ground that the jury could not have found that Jordan's use of a firearm to murder the victim was intended to further the narcotics conspiracy.

## STATEMENT OF THE CASE

After a five-week trial, on February 27, 2024, a jury convicted Jordan, also known as "Little D" and "Noid," and Ronald Washington, also known as "Tinard," of committing the October 30, 2002 murder of Mizell. The jury found that they murdered Mizell while engaged in a narcotics conspiracy and while using a firearm, in violation of 21 U.S.C. § 848(e)(1)(A) (Count One) and 18 U.S.C. § 924(j)(1) (Count Two). These convictions were supported by the testimony of 38 witnesses, including witnesses who saw Jordan shoot Mizell, witnesses who knew of Jordan's involvement in the narcotics conspiracy, and witnesses who heard Jordan admitting to the murder.

After the verdicts, Jordan and Washington moved, under Rule 29, for judgments of acquittal. On December 19, 2025, the district court addressed both defendants' motions. The court denied Washington's

motion. Despite its holding that Jordan and Washington were co-conspirators in the same underlying narcotics conspiracy and despite their also being charged with aiding and abetting liability, the court granted Jordan's motion, holding that the jury could not have found Jordan's motive for murder was related to the narcotics conspiracy.[2]

## I. Jordan's Criminal Charges

On March 4, 2021, the grand jury returned a superseding indictment, which charged Jordan with murder while engaged in a narcotics conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A) (Count One), one count of firearms-related murder, in violation of 18 U.S.C. § 924(j)(1) (Count Two), one count of conspiracy to distribute and possess with intent to distribute cocaine and 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) and 841(b)(1)(C) (Count Three), one count for using firearms in connection with Count Three, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Four), and seven counts of cocaine

[2] The court filed a corrected order on January 7, 2026.

distribution, in violation of 21 U.S.C. § 841(b)(1)(C) (Counts Five through Eleven). Washington was charged in Counts One and Two.[3] (DE:45).

On September 19, 2022, the district court granted Jordan's motion to sever Counts One and Two, related to Mizell's murder in 2002, from Counts Three through Eleven, which pertain to Jordan's drug trafficking with a firearm between 2016 and 2020. (DE:107). Counts Three through Eleven against Jordan are still pending.

On May 30, 2023, a grand jury returned a second superseding indictment ("the Indictment") to add Jay Bryant as a defendant to Counts One and Two. (DE:151). The district court granted Bryant's motion to sever his trial from Jordan and Washington's trial. (DE:184).

Trial began against Jordan and Washington on Counts One and Two on January 22, 2024, and concluded on February 27, 2024.

## II. The Trial Evidence

On October 30, 2002, Jordan, Washington, and Bryant murdered Mizell in his recording studio (the "Studio"), which was located inside 90-10 Merrick Boulevard in Jamaica, Queens, New York ("90-10

---

[3] Jordan and Washington were also charged with aiding and abetting liability in Counts One and Two. (DE:45 at 1-2).

Merrick Boulevard"). Mizell was a member of the influential hip hop group Run-D.M.C.

On the night of the murder, Bryant entered the front door of 90-10 Merrick Boulevard and let Jordan and Washington into the building through a back door. Inside the Studio, Washington pointed a firearm at a witness and demanded she lay on the floor, and Jordan approached Mizell and fired two shots at close range. One shot hit Mizell in the head, killing him. The second shot struck another witness in the leg.

The trial evidence revealed that Jordan, Washington, and Mizell had been in a narcotics conspiracy together at the time of Mizell's murder, that Mizell had received 10 kilograms of cocaine and was expecting 90 additional kilograms on consignment, that a lucrative cocaine deal in Baltimore the defendants anticipated fell through two months before Mizell's murder, and that Mizell had plans to meet with the conspiracy's cocaine supplier the day before, or day of, his murder. Only a few hours before Mizell's murder, Washington, armed with a firearm, arrived at the Studio to ask Mizell about their plans for the narcotics conspiracy, and Mizell sent him away. Washington then made

a phone call from a payphone, after which, he, Jordan, and Bryant arrived at the Studio to murder Mizell.

A. The Relationship Between Mizell, Jordan, and Washington

Mizell, who was 37 years old when he was murdered, grew up and was lifelong friends with Washington in Hollis, Queens. (SPA:54; GX:201; A:280-81, 285, 289-90). At the time of Mizell's murder, Washington lived on the couch at Mizell's family home. (A:199, 201, 206). Mizell was Jordan's godfather, and Mizell's family home was across the street from the home shared by Jordan and Jordan's father, Darren Jordan, who had worked with Mizell at times. (A:106, 190-91, 254, 524-25, 566). Jordan was 18 years old when he murdered Mizell. (A:414-15, 571).

Despite their substantial age difference, Jordan and Washington became close. (A:689-91 (Washington referring to Jordan as his "little man" and Jordan telling Washington he "got love for [him]"), GX:917). One of Mizell's best friends, Eric James, who lived in Wisconsin but visited Mizell in New York, had also seen Jordan and Washington together both inside and outside of the Studio. (A:521-22, 535, 561-64).

Though Jordan and Washington visited the Studio occasionally, neither was involved in Mizell's music business. (A:111-13, 256, 349-50, 352).

B. The Narcotics Conspiracy

Trial testimony revealed that Mizell became involved in the cocaine business in the early 1990s. (A:527-29). Mizell acted as a middle-man between his supplier and distributors. (A:264, 267, 528-29). But Mizell kept his role in the drug business a secret from the public and even close friends who were uninvolved; Mizell's friends testified that they never knew him to sell drugs. (A:95, 206, 245, 355).

James, who sold cocaine himself, explained the concept of selling drugs "on consignment," where a supplier provides drugs on credit and the purchaser pays the supplier after selling the drugs. (A:556-57, 561). In 2002, Mizell connected James to "Unc," Mizell's cocaine supplier. (A:529-30). Unc's real name was Terry Flenory. Unc ran the Black Mafia Family ("BMF"), which was a drug empire, and regularly sold kilograms of cocaine on consignment to dealers. (A:588-95). BMF operated in 40 to 50 states. (A:594).

Ralph Mullgrav, who went by "Yakim," grew up with Mizell and Washington but moved to Baltimore, Maryland; he sold cocaine in

Baltimore and later served 12 years in federal prison for doing so. (A:264-65, 268-70, 272, 345-46). Yakim testified that in 2002, his cocaine operation sold about 30 to 40 kilograms per month, using about 25 distributors in Baltimore. (A:272). Mizell had previously asked Yakim to sell one or two kilograms of cocaine at a time in Baltimore, and prior to August 2002, Yakim had sold a "little less" than 10 to 20 kilograms of cocaine for Mizell. (A:264, 267).

On a visit to New York in 2001 or 2002, James was near the Studio with Jordan and Mizell. (A:531-33). Jordan began asking James—who lived in Wisconsin—about the price of cocaine; Jordan then nudged James and asked him to tell Mizell to "put [him] on," which James understood to mean to give him cocaine to sell. (*Id.*). Mizell later confided in James that he had agreed to have Jordan distribute cocaine, and Mizell gave Jordan an ounce to sell "to try him out"; Jordan successfully sold it. (A:537-39).

Washington was less successful than Jordan in the narcotics conspiracy. Although Mizell had given Washington drugs to sell in early 2002, Washington had "messed it up." (A:536-37, 573-74). Still, Mizell kept Washington in the narcotics conspiracy. Christopher Burell,

Mizell's friend and longtime driver, testified that in the summer of 2002, Washington accompanied Mizell and Burrell to a deejaying job in Manhattan. (A:383-84, 394-95). During the ride, Mizell agreed with Washington that when Mizell obtained more drugs, Washington would sell them. (A:397-98).

In 2002, Mizell "had a line" on 100 kilograms of cocaine, but Mizell could only get 10 kilograms at that moment because there "was a drought" in the supply. (A:539). James testified that Mizell told him that Mizell, Jordan, and Washington agreed they would distribute those 10 kilograms in Baltimore because Yakim had connections there and, therefore, they could "make more money" in Baltimore, than in other places. (A:534, 539-43). Mizell discussed with James this Baltimore deal involving Jordan, Washington, and Yakim on six or seven occasions, and he told James that the cocaine distribution was supposed to be ongoing (A:543), thus confirming Mizell would receive the remaining 90 kilograms of cocaine once they were available.

### C. The Failed August 2002 Baltimore Deal With Yakim

In August 2002, Burrell drove Mizell and Washington to Washington, D.C. (A:401-02). Jordan was not present. (A:263-73, 405-

06). Mizell met with Unc in a hotel, while Burrell and Washington stayed in the car. (A:402-04; GX:606). Washington admitted to law enforcement officers in 2019 that the purpose of this trip was to discuss the terms of obtaining 10 kilograms of cocaine from Unc at a hotel, and have Washington stay in Baltimore to sell the cocaine through Yakim. (A:602-04, 609). Washington was skeptical of partnering with Yakim because they "did not get along" but nonetheless continued with the plan. (A:604). Before meeting Unc, Washington and Mizell had discussed differences in the kilogram prices of cocaine if they decided to take possession of the cocaine now in Washington D.C., or later elsewhere where they could pay less for it. Washington advised Mizell "not to be greedy" and to accept the cocaine now, which they did. (A:603-04). Washington admitted that he had met Unc prior to this meeting. (A:603).

The day after meeting with Unc, Burrell, Mizell, and Washington drove to Baltimore. (A:406). During the car ride, Mizell and Washington discussed Washington staying behind in Baltimore to sell the cocaine. (*Id.*).

When they arrived in Baltimore, Yakim called Mizell. (A:407). Burrell overheard Yakim state that if he saw Washington, he

would kill him. (A:407-09). At that point, Burrell and Washington left Mizell in Baltimore and began to drive back to New York in Mizell's car. (A:410). As they were driving, Washington told Burrell to drive around a corner; as they pulled up to Yakim, Washington rolled down the window. (A:268, 410-11). When Yakim saw Washington, Yakim went to get his gun to shoot him, but Washington and Burrell drove away. (A:269, 411).

Mizell stayed in Baltimore and met with Yakim. (A:264, 268). Mizell asked Yakim to sell cocaine for him and to allow Washington to deal drugs in Baltimore, but Yakim declined to work with Washington. (A:264-66, 273). Yakim testified that in 2002, each kilogram of cocaine would have sold for between $15,000 and $20,000 in Baltimore. (A:269). He confirmed the deal would have made a lot of money but that ultimately there was "no deal." (A:266, 273).

After a couple of days, Mizell flew back to New York. (A:411-12). There is no evidence of what ultimately happened to the 10 kilograms of cocaine, worth approximately $120,000. (A:506).

One year after Mizell's death, Washington told *Newsday* reporter Sean Gardiner that in the summer of 2002, he and Mizell had

traveled to Washington D.C. where they met a drug dealer named Unc at a hotel. (A:505-06). Unc forwarded Mizell $120,000 worth of cocaine, which Mizell brought to Baltimore; according to Washington, drug dealers ripped Mizell off and never paid him for the cocaine. (A:506).

### D. The Continuing Narcotics Conspiracy Through Mizell's Murder

Witnesses testified that between August and October 2002, Mizell was often traveling in other states or on the road with Run-D.M.C.. (A:89, 353-55, 545-46).

Jordan and Washington used this time to plan the murder. In the days approaching Mizell's murder, Washington visited the Studio approximately every other day, even though he was not involved in the music business, and did not otherwise frequent the Studio. (A:111, 257). Stephen Watford, Mizell's cousin who resided at Mizell's family residence at the same time as Washington, testified that, a couple of days before Mizell's murder, Washington asked him for .40 caliber ammunition (the same caliber ammunition Jordan would later use to shoot Mizell). (A:200, 207-08).

On October 28 or 29, 2002, Mizell was in Wisconsin with James when he received a phone call from an unidentified individual who was "yelling into the phone," with Mizell yelling back. Mizell mentioned "Tinard" (Washington) during this call. (A:545-48). Yakim had testified that Mizell was to be supplied with the cocaine in the "Midwest." (A:266).

Mizell returned to New York on October 29, 2002. (A:180, 208, 549; GX:201 at 4). He planned to leave for South Carolina on October 31, 2002, to deejay as part of a promotional tour for "Rusty Waters," a local music group comprised of Mizell, his friend Randy Allen, and Mizell's nephew, Rodney Jones, and then travel to Georgia the next day. (A:239, 345, 354; GX:608, 904).

At the same time, however, Mizell had plans for the narcotics conspiracy. Gardiner testified that, according to Washington, Mizell was supposed to meet on October 29 or 30 with an associate of Unc, the conspiracy's cocaine supplier. (A:507). On October 29, Mizell told Watford, who previously had trouble getting paid for his work with Mizell's record label, to see Mizell's accountant to straighten out Watford's finances, suggesting Mizell had or would be coming into money. (A:209-10). Also on October 29, Washington told Watford not to go to the

Studio because "[s]omething bad is gonna happen." (A:208). On October 30, Washington and Mizell discussed the plans for the narcotics conspiracy hours before Jordan and Washington murdered Mizell.

On the afternoon of October 30—the day of Mizell's murder—Washington and his girlfriend, Daynia McDonald, visited Jordan's brother, Tashawn Burns, from whom Washington obtained what appeared to be a firearm. (A:387-89, 483-87; GX:523). That early evening, as it was getting dark outside, Washington and McDonald went to the Studio where they saw Mizell, who was armed with a .380 caliber firearm. (A:80, 115, 353, 363-364, 487-89, 518).

McDonald testified that Mizell appeared surprised to see Washington there, with an "oh crap" and "oh-shit kind of look" on his face. (A:488, 500-01). Washington saw Mizell's firearm and asked Mizell, "What do you have the gun for? Why do you need a gun? You could have always called me if you need anything." (A:488-89). Washington reminded Mizell, "If you have a problem, I have a problem too." (A:502). Mizell then removed his firearm from his hip and placed it next to him on the couch. (A:488-89).

Washington then asked Mizell, "aren't we supposed to be going to Connecticut…[for] a show?" (A:489). Washington also inquired about Baltimore. (*Id.*). This conversation contained coded language about their plans for the narcotics conspiracy. As corroboration, Mizell's calendar had entries for planned trips to "D.C." (where Mizell and Washington had obtained cocaine from Unc) on October 31, 2002, and "CT" on November 1, 2002. (GX:607, 904). Yet Washington had never previously discussed going on tour with Mizell, nor did any witness involved in Mizell's music businesses testify that Washington had a role in Mizell's music. (A:111, 256, 349-50, 489). And the only time Washington accompanied Mizell on a trip to a performance, he discussed narcotics with Mizell. (*Supra* at 9-10). Moreover, Mizell was supposed to be with Rusty Waters in South Carolina and Georgia on those days. (GX:608, 904). McDonald could not hear what else Washington and Mizell discussed. (A:502-03).

Mizell sent Washington and McDonald away from the Studio, specifically tasking Washington with getting food. (A:490). On the way back to the Studio, Washington made a phone call from a payphone during which he gestured "expressive[ly] with his hands," and,

thereafter, he told McDonald that she had to leave. (A:491-93). McDonald testified that they collected her belongings from the Studio, and both left. (A:492-93).

E. The October 30, 2002 Murder of Mizell

A few hours later, a little before 7:30 p.m., Jay Bryant entered 90-10 Merrick Boulevard, which contained the Studio. (A:220, 286, 356, 424-26).

Witnesses described 90-10 Merrick Boulevard as a two-story building with one entry/exit and one exit: the main door on the first floor, which was opened by buzzer or key, and a back door on the second floor, which was locked from the outside and opened onto a fire escape, with a staircase down to the street. (A:96-98, 201-05, 242-44, 258-61, 310, 352-53, 358, 416-20). According to witnesses, almost "[n]obody used" the back door, which could not be opened by buzzer, and even witnesses who worked at 90-10 Merrick Boulevard did not know the back door existed. (A:96, 98, 205, 244, 260, 358, 432, 439).

To enter the building, one would need to be buzzed in through the front door by either the Studio or Primerica, which was a financial services firm at 90-10 Merrick Boulevard. (A:96-98, 201-05, 242-44, 258-

61, 310, 352-53, 358, 416-20). After entering the front door, there was a staircase that led to a second-floor landing, which after a right turn, continued down a hallway. The hallway had a door to Primerica on the right and then, farther down, a door to the Studio on the left. The hallway continued past the Studio, made a left angle, and led to the back door that exited onto the fire escape. (*Id.*). The fire escape was a staircase from the street to the back door of 90-10 Merrick Boulevard, which, when opened, led directly down the hallway to the Studio without the need to walk past Primerica. (*Id.*; A:71, 96, 686).

Televisions inside the Studio and Primerica displayed video surveillance inside 90-10 Merrick Boulevard. Cameras captured views of the front door, the hallway leading from Primerica to the Studio, the back door from the outside of the building, and the street. (GX:101F; A:69-71, 204-05). The cameras did not show the hallway from the back door to the Studio, or the outdoor staircase to the back door. The jury observed the camera views, the layout of the second floor, a crime scene diagram of the Studio, and photographs from both 2002 and 2022 showing the inside and outside of the building, including inside the Studio. (GX:102A-Q, 102X-Z, 103A-Q, 103S, 104B-F, 105, 702; A:57-60, 684-86, 692-93; SA:1-3).

Primera employee Tanya Davis testified that on that evening of October 30, 2002, she sat at the front desk of Primerica to buzz clients into the front door of 90-10 Merrick Boulevard, where she could see the Primerica television and down the hallway facing the stairs (away from the Studio). (A:417-22). After providing direction to the Studio to one woman, Davis later observed, on the television, a second young woman entering the front door of 90-10 Merrick Boulevard, and a man entering behind her. (A:424-27). The young woman and man walked up the stairs, with the man behind the woman who "didn't hold the door open for him," which indicated to Davis that they were not together. (A:427-28, 433-35). Davis described the man as a "very tall…young guy" who was "lanky" and "black" with "braids," "light skin," and a "shadow beard." (A:427-28). She had never seen him before. (A:428-29). "Shortly after that," Davis heard gunshots and a woman screaming. (A:431).

The jury heard testimony from Randy Allen, Lydia High, Michael Rapley, Tony Rincon, and Yarrah Concepcion, who were in the Studio with Mizell when he was murdered. Allen, who grew up with Mizell and Washington, was Mizell's best friend and a member of Rusty Waters. He lived one block from Jordan and knew him from the

neighborhood and from when Jordan occasionally visited the Studio. (A:338-40, 345, 349-50, 352). High, who was Allen's sister, also grew up with Mizell and Washington and worked for Mizell. (A:280-81, 290, 344-45). Rapley (known as "Mike B") was a rapper from Hollis who met Mizell as an adult and knew Jordan and Washington from the neighborhood. (A:89-91, 235-38, 253-56). Rincon was a college student who worked with Mizell's record label (A:83, 348-49). Rincon knew Jordan as Mizell's godson, and had previously spoken to Jordan and seen Washington. (A:106, 112-14). Concepcion was a young singer visiting the Studio for the first time that night. (A:219-20).

They all testified consistently with each other and with Davis. Notably, none of these witnesses testified that they buzzed in the man Davis saw or any other men, and Davis testified that she did not buzz anyone nor see anyone enter the building other than the two women (Concepcion and High) and the man.

The Studio had a small central room with three couches. (SA:1-2, A:685, 687-88). On the right side of the Studio's entrance were two rooms: the control room, where "the preproduction, music, [and] vocals occurred," and the recording studio. (GX:102I-K; A:99-100, 687-

88). On the left of the Studio was a storage room. (GX:102L; A:99-100, 687-88).

Concepcion had an appointment at the Studio that evening to showcase her music. (A:219-21). Concepcion testified that she saw Mizell sitting on the farthest couch with a man sitting to the right of him (Rincon), and they were both playing a video game. (A:222, 245-47). After a few minutes, Concepcion saw a young woman (High) enter the Studio and sit down. (A:223). Concepcion saw that Mizell had a firearm next to him. (A:224). High and Rincon testified similarly, including that Mizell had a firearm next to him on the couch. (A:100-03, 286-87). Rapley, Allen, and Concepcion entered the control room to listen to music, and they were still there when Mizell was shot. (A:223-27, 245-47, 361-63).

High testified that she arrived at 90-10 Merrick Boulevard by herself and did not remember if anyone followed her through the front door. (A:286). When she got to the Studio, High saw Mizell and Rincon on the couch. (*Id.*). Rincon was seated to the right of Mizell (*i.e.*, farthest from the Studio entrance). (A:100-03, 286). High sat across from Mizell to discuss logistics and present paperwork for Mizell to sign. (A:104-05,

286-88, 687-88). Mizell had a firearm on the armrest of the couch next to him. (A:103). High did not like this, so she asked Mizell why it was there; he told her not to worry about it. (A:287).

Rincon testified that as they were all talking, Jordan entered the Studio with Washington, raised the hood on his sweatshirt, and "walked directly" to Mizell to greet him with "a potential handshake, almost like a half a handshake with the arm," at which point Rincon heard "a couple of shots" and felt pain in his leg. (A:105-08, 115). Rincon saw Mizell (who had stood for the embrace) fall on Jordan, Jordan "shrug" and "shake" Mizell's body off, and Mizell fall to the floor. (A:105, 107-08). Rincon saw Washington at the Studio's entrance and heard him tell High to stay down. (A:105). Rincon testified he had no trouble seeing Jordan's and Washington's face and could even see "a little bit of [Jordan's] tattoo on his neck." (A:105-12; GX:505-07, 519). The jury saw Jordan at trial, as well as photographs of Jordan, with a large tattoo on the side of his neck, which witnesses said Jordan had in 2002. (GX:505-507; A:109-10, 192). Rincon learned he had been shot in the leg and police officers later took him to the hospital for treatment. (A:115-17, 126).

High similarly testified that she observed a "fair-skinned...African-American" man with a "tattoo…[o]n his neck"—consistent with Jordan's description—walk to Mizell, who smiled, stood up, and gave the man "a pound," meaning a greeting by hand. (A:288-89, 291). Mizell then said, "Oh shit," and High heard two gunshots. (A:288-89, 325-26). High screamed and ran to the Studio's entrance but was stopped by Washington, who ordered her to the ground at gunpoint. (A:289). The jury could see High crying and shaking during her trial testimony as she recounted what occurred. (*Cf.* A:330 (defense counsel acknowledging testifying about "this [was] difficult" for the witness)).

Expert and law enforcement witnesses corroborated this testimony. Dr. Corinne Ambrosi, who performed the autopsy of Mizell, determined that the cause of Mizell's death was a gunshot wound to his head and the manner of death was homicide. (A:178). Dr. Jagjeet Bains, who performed a gunshot residue and distance determination analysis, confirmed that the gunshot that killed Mizell was a "contact shot," which meant the shooter was less than two inches away. (A:596-99). Crime scene investigators recovered two .40 caliber shell casings next to Mizell's body. (A:61-68, 508-18). The jury also learned that three months after

the murder, on February 3, 2003, police officers recovered a .40 caliber firearm, a .40 shell casing, and 83 .40 caliber bullets from Jordan, and that, on May 14, 2003, they also recovered a .40 caliber bullet and bullet fragment from a .40 caliber firearm possessed by Jordan. (GX:320, 324, 912, 913).

Several witnesses testified that Rincon and High later implicated Jordan as the shooter and Washington as guarding the door to the Studio with a firearm. Allen testified that one or two days after Mizell's murder, Rincon told him that Jordan shot Mizell and Washington was also in the Studio. (A:366-67). Allen also testified that High described the shooter's neck tattoo to him and that Washington ordered her to the ground at gunpoint. (A:367-68).[4] Derrick Parker, a retired detective who acted as High's bodyguard after the murder, testified that shortly after the murder, High identified both Jordan and Washington as the perpetrators. (A:274-78).

---

[4] Allen testified that when he tried to speak with High again about what happened in the Studio, "she cut [him] off" and "didn't speak to [him]...for two whole years." (A:368).

After the gunshots, Rincon saw Jordan and Washington run out of the Studio and turn left towards the back door of the building. (A:113). Davis testified that after the gunshots, she saw the same "very tall" man, who had entered the front door of 90-10 Merrick Boulevard, go down the hallway, headed back towards the front door. (A:431-32). He "looked like he was like dragging his leg a little bit" and he was "taking long steps as he was going." (A:432).

The trial evidence revealed that the "very tall" man who snuck into 90-10 Merrick Boulevard behind High and later fled through the front door was Bryant, and that Jordan and Washington entered and exited 90-10 Merrick Boulevard through the back door.

Witnesses described Bryant as approximately between 6'3" and 6'5," lacking a neck tattoo, walking with a limp due to a gunshot wound, and with braids in 2002—he could not have been mistaken for either Jordan or Washington. (GX:501, 502 (photographs of Bryant); A:369, 445, 600). In contrast, Jordan was 5'9.5" and Washington was 5'10," neither had braids or a limp in 2002, and Jordan had a prominent neck tattoo in 2002 that the jury heard about from witnesses and saw in photographs. (GX:505-09, 915, A:109-10, 192). Significantly, witnesses

close to Mizell, including Rincon, were shown photographs of Bryant and did not recognize him, contradicting the defense theory that Bryant would have been able to get close to Mizell to shake his hand and that Mizell would have smiled, before Bryant killed Mizell. (GX:501-02, 504; A:116, 197-98, 251-252, 347, 525-26).[5]

Testimony was introduced about Bryant's DNA profile being part of a mixture of DNA found inside a knit hat recovered from the Studio near where Mizell had been shot. (GX:202A, 105 (M3 knit hat);

---

[5] Indeed, Bryant was connected to Jordan and Washington, but not to Mizell, through a mutual friend, Atif ("Tiff") Heathington. Tiff's brother, Zaire Flournoy, testified that Flournoy and Bryant grew up together in the Baisley Projects near Hollis and that Tiff lived one block away from the Baisley Projects with their grandmother; Flournoy, who had been arrested pursuant to a material witness warrant, did not admit he had seen Bryant and Tiff together. (A:228-30). Flournoy testified "Noid" (Jordan) grew up in Hollis with Tiff but also did not admit he had seen them together. (A:232-33). In contrast, Burrell testified that Tiff, Jordan, and Jordan's brother, Burns, were "guys from the neighborhood" and he had seen them together; he also identified them together in photographs. (A:388-94; GX:542 (photo of Tiff and Bryant), 543 (photo of Tiff, Jordan and Jordan's brother, Burns), and 547 (photo of Tiff and Jordan)). Lewis Gonzalez, Bryant's friend, testified Bryant introduced him to Tiff at the Baisley Houses in 2022, and identified Bryant and Tiff in photographs together. (A:374-81; GX:542, 543). McDonald, who dated Washington, testified she had seen Tiff and Jordan together a couple of times in 2002 and Tiff occasionally socialized with Washington then as well. (A:483-85).

A:76-77). Bryant's uncle, Raymond Bryant, testified that Bryant admitted his participation in Mizell's murder in two conversations, one in 2003 or 2004 and another in or around 2019. Raymond testified that in the first conversation, Bryant admitted he was involved in the murder and he "wouldn't have did it if [Mizell] didn't go for his gun," and Raymond believed others were at the murder based on this conversation. (A:447-50, 460-61, 464). In the second conversation, Bryant told Raymond that he was arrested because his hat was at the scene. (A:449-50).[6]

Based on the testimony that witnesses did not use the back door or even know of its existence, the jury could infer that Jordan and Washington entered through the back door to avoid detection. As the

[6] Notably, eyewitness testimony contradicts Bryant's description of Mizell going for the gun. High and Rincon said that Mizell greeted the shooter and was immediately shot in the head. Similarly, Bryant's statement that he had been arrested for the hat was false, because Bryant was not arrested in connection with the murder until 2023. Significantly, the jury was presented with all of this evidence, and the government argued in summation that there was substantial evidence proving that Jordan was, and Bryant could not have been, the shooter, and that the government did not need to prove or explain how the hat with Bryant's DNA wound up inside the Studio. (A:654). The jury apparently agreed.

witnesses testified, the back door did not require a buzzer that would alert people inside 90-10 Merrick Boulevard, and the camera view showed Jordan and Washington could wait outside the view of the camera until Bryant let them in.[7]

After Mizell's murder, James spoke to the cocaine supplier, Unc, who appeared shocked over Mizell's death. (A:550). Unc told James that any debt Mizell owed him in connection with the cocaine had died with Mizell. (*Id.*).

F. Jordan and Washington's Actions After the Murder

The evening of Mizell's murder, Washington confessed to McDonald that he killed Mizell, and, the next day, he moved out of Mizell's family home to live in hotels with McDonald. (A:493-98).

After the murder, Jordan and his father attempted to intimidate witnesses who could implicate Jordan. The day after Mizell's murder, Jordan's father shot a firearm at Washington. (A:610). Mizell's funeral was held one week after the murder. (A:118). At some point

---

[7] Ultimately, the video tape police recovered from the Studio television that night was a recording from another date (A:79), and the video tape in Primerica did not record (A:259), so that there no was recorded video from the day of the murder.

before the funeral, but after he had shot at Washington, Jordan's father placed a phone call to High that left her "shaking" and "very upset." (A:276-77). At the funeral, Jordan and several friends approached Rincon and his mother, and Jordan asked if Rincon saw who killed Mizell. (A:118). Rincon felt that Jordan was "probing to see if I did see him" at the Studio, especially because nobody else at the funeral, which a "couple hundred" people attended, had asked him the same question. (A:118-19). One month after the murder, Washington told McDonald that he "had to go meet up with Noid [Jordan]." (A:498). He returned from that meeting "[u]pset." (*Id.*). In 2003, Jordan's father and "a couple…people from the Hollis crew" approached McDonald and told her "not to say anything to the [] police." (A:498-99).

Jordan and Washington both made admissions about their involvement with the murder. In 2004, Cherubin Bastien, who lived with Jordan and was driving Jordan and Jordan's two friends, overheard Jordan talking about Mizell, stating "if I get to kill him, I'll kill him again." (A:578-80, 582-84). On another occasion that year, Bastien heard Jordan threaten a woman by saying he would "do [her] exactly just like him," referring to Mizell. (A:585-86).

In 2011, Washington was incarcerated at the Metropolitan Detention Center ("MDC") on a different charge when he asked another inmate whether he "recognized him from news about the murder of Jam Master Jay." (A:467-70; GX:910). Washington admitted he murdered Mizell and "that there was a black girl in the studio at the time, but she was unharmed because: That wasn't what we were there to do[.]" (A:471-72, 474).

In 2019, law enforcement officers interviewed Washington, who asked them, "So you're not going to get the shooter; you're just going to get the guy who stood by the door." (A:602, 606). Washington then stated, "you guys are going to put me and another person on an indictment and see who rats first." (A:606-07).

In 2020, Washington called an unknown person and explained that his "situation" was due to "Lulu" (High's nickname). The unknown person responded, "She got both – she got y'all together, as partners." (GX:902, 917; A:523, 689-91). Washington replied that he was "just…talking to the little n***a too" who was "upstairs," but Jordan had written him a "kite" saying "I understand you was mad at my pops, but I'm – me and you – because [Jordan]'s like, yo, I never asked for a

separation or nothing because I know you got love for me," referring to the separation order between Jordan and Washington. (*Id.*). Washington called Jordan "my little man" during this call. (*Id.*).

III. <u>Jordan's Post-Trial Motions</u>

On February 20, 2024, following the close of the government's evidence, Washington orally moved on behalf of both defendants under Rule 29(a) for a judgment of acquittal. (A:612-34). He argued that the trial evidence proved: (1) Jordan and Washington never joined the narcotics conspiracy because Washington left Baltimore and Jordan was not in Baltimore, (2) even if Washington had joined the conspiracy, his involvement ended when Yakim excluded Washington in Baltimore, (3) the murder could not be in furtherance of the narcotics conspiracy because the conspiracy ended in Baltimore, and (4) there was no narcotics-related motive for the murder because Yakim, not Mizell, excluded Washington. On February 26, 2024, the court denied the motions with leave to renew. (A:682-83).

On February 27, 2024, the jury convicted Jordan and Washington of both counts. (DE:298).

On April 5, 2024, Jordan filed a written Rule 29(c) motion, arguing that the trial evidence was insufficient to establish that: (1) Jordan was in an ongoing narcotics conspiracy at the time of Mizell's murder, and (2) Jordan had a narcotics-related motive for the murder or that the murder furthered the narcotics conspiracy. Jordan also included a Rule 33 motion for a new trial that argued that an alternate perpetrator theory of Bryant as the shooter preponderated heavily against the verdict and that replacement of a juror tainted the jury. (DE:292).

## IV. The District Court's Decision

On December 19, 2025, the district court granted Jordan's Rule 29 motion and denied his Rule 33 motion, holding the evidence was insufficient for a jury to find that Jordan had a narcotics-related motive for murdering Mizell or that his use of a firearm was intended to further the narcotics conspiracy, despite finding that Jordan was a member of the ongoing narcotics conspiracy at the time of the murder. (DE:322). The court denied Washington's post-trial motions. (DE:323).

### A. The District Court Held Jordan Was a Member of the Ongoing Narcotics Conspiracy at the Time of Mizell's Murder

The district court held that Jordan was a member of Mizell's narcotics trafficking conspiracy at the time of his murder. (SPA:61-64). It found that Jordan joined Mizell's conspiracy "as early as 2001" when he requested Mizell "put him on" and sold an ounce of cocaine on behalf of Mizell as a test. (SPA:61). The court held the conspiracy did not end when Yakim refused to work with Washington in Baltimore because "Yakim's refusal was clearly limited to Washington" and there was "simply no evidence that Jordan's participation in the conspiracy depended on Washington's role in Baltimore, that he lacked the ability to distribute narcotics in Baltimore, or that his involvement in the drug conspiracy was contingent on the success of the Baltimore deal." (SPA:62-63).

The court rejected Jordan's argument that there was no evidence of conspiratorial conduct after Yakim refused to work with Washington, finding "there was ample evidence of conspiratorial conduct after[wards]," including the testimony that Mizell "remained in Baltimore to negotiate with Yakim," Mizell "'had a line' on 100 kilograms

of cocaine, which was to be sold on consignment," the "intended distribution of the cocaine [was] to be 'ongoing,'" and Mizell "had not paid Unc" for all of the cocaine as of his death. (SPA:63). The court explained that "the fact that Mizell sold drugs on consignment is, alone, sufficient to allow the inference that the conspiracy did not end in Baltimore." (*Id.*). The court also found that Jordan failed to demonstrate he "took any affirmative step to withdraw from the charged drug conspiracy," and concluded that he was a member of the narcotics conspiracy when he murdered Mizell. (SPA:64).

### B. The District Court Vacated the Jury Verdict as to Jordan, Holding that Jordan Did Not Have a Narcotics-Related Motive to Kill Mizell, But His Co-Conspirator Did

Notwithstanding the above analysis, the district court held the evidence did not prove Jordan murdered Mizell for a narcotics-related motive, as required to sustain a conviction on Count One. (SPA:64-71). Yet in its opinion addressing Washington's similar claims, the court held that Washington murdered Mizell for a narcotics-related motive. (SPA:44-45).

In its opinion acquitting Jordan, the court first recounted the evidence against Jordan but omitted the events leading up to the murder,

Jordan's role in the murder, and any conspiracy events for which Jordan was not present. (SPA:66). Such evidence, the court stated, "related exclusively to Washington or was otherwise unconnected to Jordan." (*Id.*). Without that evidence, the court stated the remaining evidence "establishes that Jordan agreed to sell cocaine on behalf of Mizell and was friendly with Washington, as discussed *infra*, [but] its reach does not extend to the motives advanced by the Government." (*Id.*).

The court stated that the three murder motives postulated by the government in its opposition brief were unsupported by the evidence against Jordan: (1) retaliation against Mizell when he was unable to secure the Baltimore deal with Yakim; (2) elimination of "Mizell as the middleman in the conspiracy," or (3) theft of cocaine or profits from cocaine sales from Mizell. (SPA:67-68). The court limited its review to these theories.

With respect to the first motive, the court stated that, because there was no evidence that Jordan's role in the narcotics conspiracy depended on Washington and no evidence that Jordan himself was told he could not sell in Baltimore, the jury could not have reasonably inferred that Jordan would have sought to retaliate against Mizell for the failure

of the Baltimore deal—despite evidence that the deal would have been lucrative. (SPA:66-67). In contrast, the court found Washington had a narcotics-relative motive for the murder because "Washington was excluded from a potentially lucrative Baltimore deal and sought to retaliate against Mizell for his exclusion." (SPA:45).

The court briefly addressed the second motive, finding there was no evidence "that Jordan was dissatisfied by his portion of revenue from drug sales, was in contact with any supplier, or otherwise…arrange[d] to carry on Mizell's operation." (SPA:67).

The court similarly assessed the third motive, stating there was no evidence that "Jordan knew about the scheduled meeting between Mizell and his supplier, knew that there would be…cocaine at the Studio, or made arrangements to distribute any additional cocaine himself." (SPA:67-68).

The district court described the cases relied upon by the government as featuring direct evidence of the defendant's motive—either through testimony of a defendant's admission or cooperator testimony. (SPA:68-71). In contrast, the court emphasized there was no "link" between "the failed Baltimore deal and Jordan's decision to

participate in Mizell's murder," and no direct "evidence of a personal dispute between Jordan and Mizell," or that Jordan sought to enhance his role in the conspiracy. (SPA:70-71).

Finally, the district court held that the failure to prove a narcotics-related motive for Count One doomed Count Two because the evidence did not reveal any motives that would afford some advantage to the narcotics conspiracy. (SPA:73).

### C. The District Court Improperly Undercut the Jury's Factfinding Role in Rejecting the Identification of Jordan as Mizell's Shooter

When denying Jordan's Rule 33 motion, the district court concluded the evidence sufficed to show that Jordan fatally shot Mizell. The court made clear, however, its belief that it was "even more reasonable" to find that Bryant, not Jordan, was the shooter, but denied the motion only because "Rule 33 requires more." (SPA:76). In arguing that Bryant was likely the shooter, the court recounted various evidence: (1) a hat inside the Studio with Bryant's DNA, (2) Bryant's boast to his uncle that he was part of the murder and "he 'did it' because Mizell went for his gun" (contrary to the eyewitness testimony) and a second boast that his hat was found at the scene, (3) Davis's testimony that an

individual matching Bryant's description entered and exited 90-10 Merrick Boulevard before and after the shooting (consistent with the government's theory), (4) eyewitness testimony that there was a single shooter in the Studio (consistent with Jordan being the shooter), and (5) High's testimony that (when she was sitting down on the couch looking up at the shooter) the shooter seemed "tall." (SPA:75-76; A:324). Notably, this evidence of Bryant's purported role as the shooter was presented to and rejected by the jury.

The court wondered why Bryant, who was unknown to Mizell, "would be given th[e] role" of walking into the front door of the building to let Jordan and Washington in through the back door (SPA:77)—even though testimony explained the front door's buzzer system, that Jordan and Washington had been to the Studio (implying they knew about the buzzer system and video cameras), and that Jordan and Washington were familiar to the people inside the Studio (implying they knew they would be identified on camera before they made it to the Studio). The court also speculated why Jordan and Washington "made no effort to conceal themselves" (*id.*), which contrasted with Rincon's testimony that

Jordan had put his hood on, and it failed to consider the intimidation of High, Rincon, and McDonald by Jordan and his father after the murder.

The court, however, found that evidence in the record supported the government's theory that Bryant's role was to open the back door to grant Jordan and Washington entry to the building, and that Jordan was the shooter. (SPA:76-77). It pointed to: (1) testimony from Davis who observed Bryant enter the front door behind High and later leave through the front door, (2) Rincon's eyewitness testimony that he had "no doubt" Jordan was the shooter, (3) High's eyewitness testimony that the shooter had a neck tattoo, and (4) Bastien's testimony regarding Jordan's statements about the murder. (*Id.*).

But the court ignored other substantial evidence establishing Jordan as the shooter, including testimony from (1) Allen that Rincon had identified Jordan as the shooter days after the murder, (2) Allen that High had described the shooter's neck tattoo, (3) Parker that High had identified Jordan as the shooter, (4) Rincon that Jordan and his friends approached him at Mizell's funeral to ask "if [he] saw who did it" which made him feel as if Jordan was "probing to see if I did see him," (5) Parker that Jordan's father called High shortly after the murder and she was

"shaking" and "very upset," and (6) McDonald that Jordan's father told her not to talk to the police, as well as (7) the major physical differences between Bryant and Jordan, and (8) the eyewitness testimony that Mizell smiled and embraced the shooter immediately prior to his execution, consistent with knowing the killer, Jordan. The court also ignored testimony that when Washington arrived at the Studio earlier that day, Mizell was surprised to see him and appeared uncomfortable. A rational jury could reasonably infer from that reaction that, when Jordan and Washington returned to the Studio to murder Mizell, they knew they had to gain access to the building discreetly; otherwise, Mizell might not have buzzed them in, or he would have had time to prepare himself for a confrontation using his own firearm that Washington saw hours earlier.

The court also questioned High's identification of Jordan's neck tattoo, stating that there was no evidence High told officers on the night of Mizell's murder that the shooter had a neck tattoo. (SPA:76). The court ignored High's testimony that she was not honest with officers at the time of the murder because she was afraid and that she ultimately told her brother, Allen, about the neck tattoo. (A:292, 368).

Although Rincon did not initially identify Jordan as the shooter, the court recognized that the "jury clearly credited Rincon's testimony" that he "hid the truth" because he was afraid of retaliation, over Raymond Bryant's testimony that his nephew, Bryant, admitted he killed Mizell. (SPA:77). The court ignored that the jury could also reasonably credit Rincon because of his identification of Jordan to Allen days after the murder and his fear of Jordan, especially after he approached him at Mizell's funeral. (A:117-19, 169, 366-67).

## SUMMARY OF ARGUMENT

The district court erred in granting Jordan's motion for a judgment of acquittal, and its decision should be reversed. First, the court failed to consider all the evidence in the record and further, disregarded evidence of the narcotics conspiracy if Jordan was not present at, or directly communicated about, such events. Second, the court ignored the inferences reasonably drawn from the timing of events surrounding Mizell's murder, Jordan's role as the shooter, and Jordan and Washington's conspiratorial relationship, instead requiring direct evidence of Jordan's intent. Third, while finding sufficient proof of a narcotics-related motive as to Washington, the court ignored that Jordan,

too, could have shared that same motive, in addition to having his own narcotics-related motives. Finally, the court failed to consider aiding and abetting liability. The failures to view the totality of the evidence supporting Jordan's narcotics-related motive in the light most favorable to the government, and to draw all reasonable inferences in favor of the government, led the court to erroneously substitute its own determination of the weight of the evidence for the determination of the jury. The jury's verdict regarding Jordan's intent is supported by the evidence, and the district court's order should be reversed.

# ARGUMENT

## I. Applicable Law

### A. Standard of Review

This Court reviews de novo the granting of a Rule 29 motion, "applying the same standard the district court applies in review of the evidence." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019); *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012).[8] Questions related to the interpretation of a criminal statute are reviewed de novo. *United States v. Napout*, 963 F.3d 163, 178 (2d Cir. 2020).

### B. Rule 29

Rule 29 provides that a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. But this Court has instructed that "[t]he jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

---

[8] Unless otherwise noted, citations, internal quotation marks, and footnotes are omitted, and all alterations are adopted.

When assessing a Rule 29 motion, a reviewing court must view "the evidence presented in the light most favorable to the prosecution," drawing all permissible inferences in the government's favor. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Guadagna*, 183 F.3d at 129. The court must also consider the evidence as a whole and not "piecemeal or in isolation," *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019), "as each fact may gain color from others," *Guadagna*, 183 F.3d at 130. In addition, "[m]atters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments." *United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cir. 1992). In deciding which inferences to draw, the jury is entitled to use its common sense, *Klein*, 913 F.3d at 79, and, therefore, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *Guadagna*, 183 F.3d at 130. "If the court concludes that either of two results, a reasonable doubt or no reasonable doubt is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

The reviewing court must recognize that "knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005).

Moreover, this Court has emphasized that "[w]hen a defendant challenges the sufficiency of the evidence in a conspiracy case, deference to the jury's findings is especially important…because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008). "[S]eemingly innocent acts" taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general. *United States v. Mariani*, 725 F.2d 862, 866 (2d Cir. 1984); *United States v. Carson*, 702 F.2d 351, 362 (2d Cir. 1983). Accordingly, a defendant challenging a jury's guilty verdict, particularly on a charge involving an underlying conspiracy, "bears a heavy burden." *Santos*, 541 F.3d at 70.

C. Section 848(e)(1)(A)

Count One applies to anyone who, while "engaging in" a qualifying drug offense, "intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." 21 U.S.C. § 848(e)(1)(A). A defendant need not be "actively engaged in" drug dealing at the time of the murder. *Santos*, 541 F.3d at 67. Rather, a conspiracy to distribute drugs may serve as the predicate offense (as it did here), and "[s]o long as the defendant enters into the unlawful agreement before the killing, and the conspiracy is ongoing when the killing occurs," the "engaging in" element is satisfied. *Id.* at 68.

In addition to this temporal requirement, courts have "required a 'substantive connection' between the defendant's drug activities and the charged killing in part to address the concern that, absent such a requirement, § 848(e)(1)(A) would be subject to constitutional challenge on Commerce Clause grounds." *United States v. Aguilar*, 585 F.3d 652, 658 (2d Cir. 2009). Proof of a drug-related motive "fully satisfies [the] 'nexus' requirement" of Section 848(e), *id.* at 660, but "the government has no burden to establish that a drug-related motive

was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose," *United States v. Desinor*, 525 F.3d 193, 202 (2d Cir. 2008). Nor must the killing be committed, even in part, "in order to further" the charged drug crime. *Aguilar*, 585 F.3d at 660-61.

D. Section 924(j)(1)

Count Two criminalizes causing the death of a person through the use of a firearm "in the course of a violation of" Section 924(c). 18 U.S.C. § 924(j)(1). Section 924(c) in turn states that "any person who, during and in relation to...any…drug trafficking crime...uses or carries a firearm" is guilty of a crime. 18 U.S.C. § 924(c)(1)(A). "The phrase 'in relation to' is expansive." *Smith v. United States*, 508 U.S. 223, 237 (1993); *United States v. Nina*, 734 F. App'x 27, 30 (2d Cir. 2018). It "clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." *Smith*, 508 U.S. at 238; *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001) (government need only show "some nexus between the firearm and the drug selling operation"). "[T]he ultimate question is whether the firearm afforded some advantage

(actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *United States v. Snow*, 462 F.3d 55, 62-63 (2d Cir. 2006) ("[A] drug dealer may be punished under § 924(c)(1)(A) where the charged weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself.").

## II. The Jury's Verdict Is Supported By The Evidence And The District Court Erred By Not Considering or Crediting Certain Evidence That Supported the Jury's Verdict

In overturning the jury's verdict, the district court both overlooked and minimized evidence that permitted the jury to find that Jordan had several narcotics-related motives to murder Mizell, as well as that Jordan murdered Mizell to support Washington's narcotics-related motives. The jury could have reasonably inferred that Jordan killed Mizell as retaliation for failing to secure the lucrative Baltimore deal for him and Washington, or to eliminate Mizell to further his and Washington's roles in their shared narcotics conspiracy.

A comparison of the court's decisions for Jordan and Washington reveals the court refused to consider certain evidence about the narcotics conspiracy for Jordan that it considered for Washington. The court erroneously concluded there was no evidence that Jordan knew

of such facts, despite his roles in the conspiracy and the murder—in which he was the shooter—and his close relationship with Washington. In taking this myopic view of the evidence, the court erred by requiring direct evidence of Jordan's intent, rather than relying on circumstantial evidence that this Court has stated may alone support a jury verdict.

### A. The District Court Erroneously Refused to Consider Trial Evidence Against Jordan That It Considered Against Washington

The district court did not consider for Jordan any evidence about the failed Baltimore deal with Yakim or Mizell's scheduled meeting with the cocaine supplier's associate, yet it did so for Washington, despite ample evidence that Jordan and Washington were in the same narcotics conspiracy with Mizell, and both had agreed with Mizell to sell the 10 kilograms with Yakim. In its opinion for Washington, the court recounted the sufficient evidence of Washington's narcotics-related motive as the following:

> Washington entered a conspiracy with Mizell and Jordan to distribute ten kilograms of cocaine in Baltimore; in August 2002, Mizell and Washington traveled to Baltimore to consummate a deal to distribute ten kilograms of cocaine; Yakim refused to work with Washington; Washington returned to New York while Mizell remained in Baltimore to

> continue negotiation discussions; the Baltimore deal would have been lucrative; in October 2002, Mizell was scheduled to meet with his supplier; Washington showed up to the Studio with a firearm the same day of the meeting (or the day after); when Washington saw Mizell at the Studio, Washington informed Mizell that Mizell did not need a firearm because he had Washington; Washington asked Mizell, in coded language, about his plans for the drug conspiracy; after leaving the Studio, Washington made a phone call and then told his girlfriend not to return to the Studio; the same day of Mizell's meeting with his supplier (or the day after), Mizell was murdered; Washington was sleeping on Mizell's couch at the time of the murder; Washington and Jordan spent time together inside and outside of the Studio; and Washington and Jordan met up after Mizell's murder.

(SPA:44 (emphasis added)). The court did not list the underlined facts, which related to the narcotics conspiracy, in connection with Jordan. (SPA:66 (noting it would not credit the "further evidence" that "the Government highlights" because it "related exclusively to Washington or was otherwise unconnected to Jordan")).

Both decisions also omitted trial evidence crucial to establishing Jordan's motive, such as the facts that:

- Washington had met Unc prior to August 2002;
- Mizell traveled on and off between August and October 2002;

- days before the murder, Washington sought .40 caliber ammunition—the caliber ammunition that Jordan used to murder Mizell and still possessed three months after the murder;

- the day before the murder, Mizell returned to New York from the Midwest—which is where he was to receive the cocaine on consignment—and told his cousin Watford (who lived in the same house as Washington) to see Mizell's accountant, suggesting Mizell had or would be coming into money;

- while in the Midwest, Mizell angrily mentioned Washington's nickname, Tinard, while on a phone call;

- the day before the murder, Washington warned Watford to stay away from the Studio because "[s]omething bad is gonna happen";

- the day of the murder, Washington retrieved a firearm from Jordan's brother; and

- Bryant was connected to Jordan and, to a lesser extent, Washington and no other witnesses associated with Mizell knew him.

The jury heard this evidence, along with Washington's knowledge that Mizell was to meet imminently with Unc's associate, Washington's inquiry of Mizell hours before the murder about the narcotics conspiracy and travel to Baltimore, Washington's subsequent phone call that led to Jordan's arrival, Jordan and his co-conspirators' surreptitious entry into the Studio, and Jordan's fatal shooting of Mizell. Together, this proof

permits the reasonable inference—one the jury clearly drew—that Jordan and Washington planned Mizell's murder for when they anticipated that Mizell would obtain the remaining kilograms on consignment, or have profits Mizell acquired from selling the 10 kilograms without Jordan and Washington and after paying Unc (as suggested by Mizell's instruction to Watford to see his accountant).

The jury could also infer that Mizell's expressed surprise and display of his firearm when Washington arrived at the Studio earlier on October 30 confirmed Washington's concern about being cut out of further cocaine deals. Excluded from a lucrative deal in Baltimore with Yakim, Washington murdered Mizell out of retaliation and to further his role in the conspiracy. Although Jordan was not present in Baltimore, he had agreed with Mizell and Washington to participate in the Baltimore deal and stood to gain if the deal were successful. The jury could have reasonably inferred that Washington's subsequent call on the payphone was to inform Jordan of Mizell's presence at the Studio and his conversation with Mizell, and to initiate their plans to murder Mizell. Like Washington, Jordan could have thought that Mizell had sold the 10 kilograms and kept the profit for himself.

Indeed, if only Washington intended to murder Mizell, he could have fatally shot Mizell when he first visited the Studio with his girlfriend, especially as he had no qualms about obtaining the firearm from Jordan's brother in his girlfriend's presence or later admitting the murder to her. But Washington's subsequent phone call and Jordan's role as the shooter confirm Jordan agreed to commit the murder and had a motive to do so. Additionally, from Jordan and Washington's close relationship, the jury could have reasonably inferred that, under the older man's influence, Jordan would have agreed to murder Mizell to avenge the Baltimore slight to Washington.

### B. The District Court Ignored the Timing and Circumstances of the Murder, Including Jordan's Role as the Shooter, in Connection with Jordan's Knowledge and Motive

In response to the government's argument that the murder can "assist in proving the substantive connection between the narcotics conspiracy and the murder," the district court stated "[w]hile that may be true, the evidence of the murder itself must be accompanied by other evidence supporting the requisite nexus." (SPA:71). But the court failed to consider the evidence—the timing and circumstances of the murder—that supported this nexus.

First, the district court ignored the necessary coordination among the co-conspirators to effectuate the murder. As witnesses testified, Jordan and Washington had been inside the Studio. All the witnesses associated with Mizell knew about the buzzer system to gain entry to the front door of 90-10 Merrick Boulevard and that a television inside the Studio revealed whoever was headed towards the Studio from the front door. However, the evidence showed that the back door did not use a buzzer system, and nobody entered that way.

The fact that Primerica employee Davis did not see Jordan and Washington, but saw Bryant, meant that Jordan and Washington coordinated in advance to enter through the back door. This plan could not have been formulated at the last minute, because it involved Bryant, who had never been seen in the Studio and who was connected only to Jordan and, to a lesser degree, Washington. The jury could infer Bryant's participation was secured in advance, given his role in piggybacking into 90-10 Merrick Boulevard and bypassing Primerica and the Studio to open the building's back door where Jordan and Washington laid in wait.

The district court perceived a "conflict" in the government's theory of Bryant's role because Jordan and Washington had "ready

access" to the Studio and were unmasked during the murder. (SPA:77). But when Washington went to the Studio earlier that day, Mizell was surprised to see him, had an "oh-shit kind of look" on his face, and displayed his firearm, before tasking Washington with an errand that required him to leave the Studio. (*Id.*). This interaction occurred the day after Mizell was heard yelling angrily on a phone call about Washington. The jury could infer that Washington knew if he attempted to overtly re-enter the Studio, Mizell would not buzz him into the building or would be prepared with his firearm that Washington saw earlier that evening. The jury could also conclude that Jordan would not enter the front door to let in Washington through the back door because Jordan's presence would catch Mizell's attention as his godson and as Washington's narcotics co-conspirator. Moreover, the court failed to consider Rincon's testimony that Jordan wore a hood during the murder, as well as evidence of the intimidation of High, Rincon, and McDonald by Jordan and his father after the murder.

Jordan's advance preparation for the murder is further supported by the evidence showing Jordan shot and killed Mizell using .40 caliber ammunition a few days after Washington asked Watford for

such ammunition and told him to stay away from the Studio because "[s]omething bad is gonna happen." (A:200, 207). The day of the murder, Washington secured a firearm from Jordan's brother, and, when Jordan and Washington arrived at the Studio, each had a firearm. Jordan's involvement, therefore, was not coincidental or last-minute, but intentional.

Further, given that the murder was planned in advance, the district court failed to consider why Jordan and Washington chose to kill Mizell on October 30. Defense counsel argued in summation that if the murder were connected to the failed deal with Yakim, Jordan would not have waited two months to murder Mizell. (A:656-57). But testimony established that Mizell often traveled between August and October, Washington visited the Studio approximately every other day leading up to the murder, and Washington knew Mizell was meeting with Unc's

associate on October 29 or 30.[9] Further, Mizell returned from Wisconsin to New York on October 29, and Yakim had testified Mizell was to be supplied with cocaine in the Midwest.

Even though Washington arrived at the Studio with a firearm on October 30, he did not shoot Mizell immediately but rather asked him about their plans for the narcotics conspiracy in Connecticut and Baltimore. Washington's questioning revealed that he intended to gather information about the conspiracy before the defendants murdered Mizell. The jury heard evidence that Mizell and Washington went to Baltimore with 10 kilograms of cocaine but that Mizell did not sell those drugs through Yakim. There was no evidence of what happened to the 10

---

[9] Although there was no evidence about the purpose of Mizell's meeting with Unc's associate (*e.g.*, whether to receive the remaining cocaine, negotiate the price of the cocaine to be picked up later, or to pay for the cocaine), the jury could reasonably infer that when Jordan and Washington went to murder Mizell on October 30, one motive could have been to rob him of the remaining 90 kilograms on consignment that they thought Mizell was receiving from this associate, or to rob Mizell of the profits Mizell had received from cocaine sales after paying the associate as part of the consignment agreement. *See United States v. Campbell*, 850 F. App'x 102, 103-04 (2d Cir. 2021) ("[T]o the extent that appellants suggest that the sufficiency analysis as to their involvement in the marijuana conspiracy should not include the circumstances surrounding their participation in [the] murder, we disagree.").

kilograms of cocaine; yet, two months later, Washington asked Mizell about their plans, including in Baltimore.[10] Whether Washington asked these questions to (1) learn if Mizell still planned to have Jordan and Washington sell in Baltimore as previously agreed (but now without Yakim), (2) confirm their fear that Mizell had enlisted others to sell the kilograms, or (3) determine the status of the cocaine on consignment, all are reasonable inferences the jury could have drawn.

Further, after speaking with Mizell about the narcotics conspiracy, Washington, agitated, called someone on the phone. (A:491-92). Hours later, Washington and Jordan entered the Studio and shot Mizell. The jury could reasonably infer from Jordan's arrival and Washington and Jordan's relationship that Washington had called

---

[10] The jury heard testimony that Washington told a reporter that Mizell was "ripped off" by drug dealers of the 10 kilograms in Baltimore and was never paid for it. The jury could have believed this was a lie by Washington to shift suspicion, or it was the truth and caused even greater resentment by both defendants towards Mizell for mishandling the $120,000 of cocaine; either inference would support the jury's verdict. *See United States v. Stanley*, 928 F.2d 575, 577 (2d Cir. 1991) ("[T]he jury was entitled to disbelieve [the defendant's] testimony, and use its disbelief to supplement the other evidence against him.").

Jordan and relayed that it was time to proceed with Mizell's murder. *See Campbell*, 850 F. App'x at 106 (video surveillance showing Syder outside the crime scene before his co-conspirators arrived to commit the murder permitted the inference that Syder contacted them to set the plan in motion).

Once Jordan and Washington entered the Studio, Jordan shot Mizell in the head while Washington guarded the Studio door. Jordan did not wait on the sidelines while Washington committed the murder—he shot to kill. *Id.* (considering Syder's "key role in [the] murder in determining whether he was a knowing member of the [narcotics] conspiracy"). Washington could have killed Mizell when he first questioned him at the Studio; instead, he made a phone call and waited for the arrival of Jordan, who could get closest to Mizell after Washington's confrontation with him. Even if Jordan murdered Mizell at Washington's behest—which the jury could reasonably infer based on the evidence—Jordan's motive would still be related to the conspiracy.

In response to the government's reliance on the murder's circumstances to prove Jordan's motive, the district court cited *Santos*, in which the defendant was told to murder two people on behalf of a

cocaine dealer, as instructive. In *Santos*, there was direct evidence of a communication proving the defendant's intent. 541 F.3d at 66; (SPA:71). But the court's analysis improperly equated Jordan with the otherwise-uninvolved hired henchman in *Santos*, who could not have known the murder was in connection with narcotics until he was told. In contrast, Jordan was already a member of the ongoing narcotics conspiracy when he murdered Mizell.

"[W]here the government presents evidence tending to show that the defendant was present at a crime scene under circumstances that logically support an inference of association with the criminal venture, a reasonable juror could conclude the defendant was a knowing and intentional criminal conspirator." *Snow*, 462 F.3d at 68. Here, evidence revealed that the lucrative deal Jordan and Washington were promised in Baltimore with Yakim did not occur and that Jordan was still involved in an ongoing narcotics relationship with Washington and Mizell when he shot Mizell. To hold that Washington's motive for participating in that murder was related to the narcotics conspiracy, but Jordan's was not, fails to consider all the trial evidence collectively. *See United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("The

government may prove the defendant's knowing participation in a conspiracy through...a defendant's association with conspirators in furtherance of the conspiracy, his presence at critical stages of the conspiracy that cannot be explained by happenstance,...[and] acts that exhibit a consciousness of guilt.").

The district court's refusal to consider the evidence of the murder for Jordan appears guided by its belief that Jordan was not the shooter. In its decision rejecting Jordan's Rule 33 motion, the court opined about how it was "even more reasonable" that Bryant, not Jordan, was the shooter. (SPA:76). For the court to believe that Jordan was not the shooter would require it to disbelieve numerous witnesses: Rincon (who identified Jordan by name and described the embrace between Jordan and Mizell), High (who described the shooter bearing Jordan's characteristics and described Mizell's smile to the shooter), Allen (who testified Rincon identified Jordan by name and High identified Jordan by tattoo), and Parker (who testified High identified Jordan by name). The court is not permitted to make such a determination on a Rule 29 sufficiency analysis. *See, e.g.*, *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to

determine whether a witness who may have been inaccurate, contradictory[,] and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony."); *United States v. Plitman*, 194 F.3d 59, 67 (2d Cir. 1999).[11]

### C. The District Court Gave Little Weight to the Conspiratorial Relationship and Favored Direct Evidence Over Circumstantial Evidence to Prove Jordan's Knowledge

The district court discounted the relevance of any events for which Jordan was not physically present, which failed to grant the government every reasonable inference from the evidence. The timing of these events and Washington and Jordan's pre-existing, close conspiratorial relationship raise a reasonable inference that Washington called Jordan and that the murder was related to both Mizell's meeting with the cocaine supplier associate and Mizell's conversation with Washington about drug trafficking hours earlier. Because, as the district court found, this evidence supports Washington's motive for killing Mizell at the Studio that night, it beggars belief to suppose that Jordan,

---

[11] The court also ignored testimony from Mizell's friends who had never heard of or seen Bryant and the evidence of intimidation by Jordan and his father after the murder.

who was already his narcotics co-conspirator and did the shooting with him, killed Mizell, his godfather, without any narcotics-related motive.

After determining there was "no evidence that Jordan knew about Yakim's refusal to work with Washington in August, or about the meeting between Mizell and the cocaine supplier in October," the court held that the jury could not conclude "that Jordan had a drug-related motive to kill Mizell." (SPA:65-66). But Jordan's knowledge of Yakim's refusal to work with Washington in August was not a prerequisite to his having a narcotics-related motive for the murder. Jordan agreed to sell cocaine in Baltimore together with Washington through Yakim on behalf of Mizell. (A:534, 538-40). It was reasonable for the jury to infer that, if the deal with Yakim was not completed, Jordan would have known about that failure, regardless of whether he knew the exact reason for it. As James testified, Mizell, Jordan, and Washington agreed that they would distribute the 10 kilograms in Baltimore because Yakim had connections there and, therefore, they could "make more money" there. (*Id.*). And, as Yakim testified, the deal would have been lucrative, but it did not happen. (A:266, 273). To harbor a motive against Mizell, Jordan did not need to know that Yakim refused the deal and Mizell was not able to

convince Yakim to sell. The fact that the lucrative deal did not occur meant that Jordan did not receive the expected payout in August from the deal that Mizell had promised him, providing his own narcotics-related motive for the murder.

Nor was the jury required to find Washington told Jordan about Mizell's meeting with Unc's associate in October to infer that Jordan's motive was related to the narcotics conspiracy. Even if Washington had not informed Jordan of this meeting, the evidence permitted the jury to infer that Jordan held his own resentment from the failed Baltimore deal with Yakim. It also permitted the jury to infer that Jordan was sufficiently close to Washington to aid with Washington's narcotics-related motive to murder Mizell. The finding of motive does not depend on whether Washington informed Jordan of Mizell's meeting with the cocaine supplier.

Nonetheless, the jury could reasonably infer that Jordan knew both these facts. It was "common sense" for the jury to infer that if the deal with Yakim in Baltimore was not completed, Jordan would have asked Washington why, given Jordan's promised role in that lucrative deal and Jordan's eagerness to sell cocaine outside of New York. *Klein*,

913 F.3d at 79; *see Ratzlaf v. United States*, 510 U.S. 135, 149 n.19 (1994) (noting the "jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct"). The jury could infer that Washington would have disclosed the conflict with Yakim to Jordan, given their close relationship and Washington's admitted skepticism about working with Yakim. Even if Washington lied about the reason for the deal's failure, Jordan would have known that the lucrative deal with Yakim had fallen through despite Mizell's promises.

Indeed, the district court ignored that Jordan and Washington participated in the same narcotics conspiracy and planned to sell cocaine together. As the court held, even though Jordan was not on the trip to Baltimore, which the evidence revealed was an initial meeting to propose the deal,[12] the narcotics conspiracy began before the Baltimore deal, was meant to be ongoing, and there was no affirmative withdrawal by Jordan from the conspiracy. (SPA:63-64); *United States*

---

12 While Mizell, Jordan, and Washington agreed to sell in Baltimore, the trip to Baltimore was the first time Mizell asked Yakim for permission to have Washington distribute with him. (A:264-66).

*v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1979) ("Hibernation for a few months does not necessarily signal the end of a criminal partnership," and "[u]nless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators").

The jury heard that, shortly after his arrest in 2020 for Mizell's murder, Washington referred to Jordan as his "little man" and recounted that Jordan told him that Jordan "got love for [him]." (A:689-91). At the time of the murder, Washington lived across the street from Jordan and had access to him. When Washington needed a firearm for the murder, he secured it from Jordan's brother. Further, Jordan and Washington were seen together in and outside the Studio throughout 2002, and Jordan met with Washington one month after the murder. Given their close co-conspirator relationship at the time of Mizell's murder and their plan to sell cocaine together, a jury could reasonably infer that Jordan and Washington shared information about the narcotics conspiracy with each other. In light of their relationship and significant difference in age, the jury could also reasonably infer that Washington had influence over Jordan and convinced him to retaliate

against Mizell because Washington's problems were Jordan's problems. (*cf.* A:502 (Washington saying to Mizell, "If you have a problem, I have a problem too.")).

For the same reasons, the jury also could have reasonably inferred that Washington told Jordan about the meeting between Mizell and the cocaine supplier's associate in October. Substantial evidence showed that Jordan and Washington arrived together at the Studio the day of, or day after, that meeting to murder Mizell—and only hours after Washington confronted Mizell about the narcotics conspiracy and then made an agitated call from a payphone. *See, e.g.*, *United States v. Djibo*, 850 F. App'x 52, 56 (2d Cir. 2021) (defendant's "conduct and his relationship with his co-conspirator were sufficient to support a reasonable inference that [defendant] knew" about the drugs as part of the conspiracy); *Campbell*, 850 F. App'x at 105-06 ("[J]urors may infer a defendant's knowledge of the object of a conspiracy…where there is evidence of such a trust relationship."). Moreover, Jordan and Washington's entry into 90-10 Merrick Boulevard and the murder itself required advance planning that required communications between Jordan and Washington. Critically, Jordan was the one to shoot Mizell.

No evidence showed a personal conflict between them, yet substantial evidence demonstrated Jordan's entry into the narcotics conspiracy through Mizell, Jordan's willingness to sell cocaine, and Mizell's agreement to include him in the Baltimore distribution. Therefore, the jury could infer that Jordan's intent in killing Mizell was related to the narcotics conspiracy. As the government argued in summation, Jordan's murder of his godfather could not be understood as anything but related to the narcotics conspiracy. (A:635, 643-44).

In ignoring this critical evidence, the district court refused to draw all inferences in the government's favor and instead effectively demanded "smoking-gun" direct evidence of motive or pre-murder discussions, contrary to this Court's guidance that jurors may draw reasonable inferences from circumstantial evidence. *See United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998) (per curiam) ("most evidence of intent is circumstantial"); *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) (finding "baseless" the argument that "circumstantial evidence is inherently weaker than direct evidence"); *accord United States v. Huezo*, 546 F.3d 174, 182-83 (2d Cir. 2008) (jury could infer defendant's knowledge and specific intent to commit money laundering from his

participation in transporting bags he did not review, his special treatment of one such bag, and from the evidence that he resided with his co-defendants).

The district court incorrectly distinguished the cases cited by the government that did not feature direct evidence of motive, *Campbell*, *Glenn,* and *Vernace*. *Campbell* involved three defendants, Peter, Campbell, and Syder, who murdered an individual that attempted to rob the stash house used in their narcotics conspiracy. 850 F. App'x at 102-04. This Court found that while there was substantial direct evidence connecting the roles of defendants Campbell and Peter in the murder to the narcotics conspiracy, the evidence was circumstantial as to defendant Syder. *Id.* at 103-06.

For Syder, the "only pre-murder evidence" of his role in the narcotics conspiracy was that he was seen at a known marijuana hangout, which was, on its own, insufficient to prove his role in the conspiracy. *Id.* at 106. But this Court stated the jury could consider Syder's "key role in the murder," specifically that he was the one "leading the armed charge" and "first to fire his gun," in determining whether he was a "knowing member of the marijuana conspiracy." *Id.* Further,

surveillance video showed Syder standing outside a deli where the victim was and Syder's co-conspirators arriving and opening fire a few minutes later. *Id.* at 104, 106. From this evidence, this Court held that the jury could "infer" that Syder was the first to identify the victim and notified his co-conspirators of the victim's location so they could execute the murder plan.[13]

The same inference from *Campbell* can be drawn here. After Washington left the Studio to make a call, he and Jordan arrived at the Studio together to murder Mizell. From this evidence, the jury could infer that Washington relayed to Jordan that it was time to execute the murder they had planned. Like Syder, Jordan's arrival and his role in the murder similarly demonstrated that he used a firearm to further the narcotics conspiracy; he helped to achieve the defendants' purpose of retaliation or of robbery of the cocaine or funds. *Campbell*, 850 F. App'x at 107; *see also Santos*, 541 F.3d at 69 ("[A]cts—including killings—may and often do serve as powerful circumstantial evidence that the charged

---

[13] The district court described evidence in *Campbell* for the wrong defendant (Peter) and incorrectly described the jury's inferences regarding circumstantial evidence as direct evidence. (SPA:69).

conspiracy existed and that the actor joined it. Thus, although a murder committed by the defendant in furtherance of a drug conspiracy cannot itself satisfy the drug-offense element of section 848(e)(1)(A), it can, in appropriate circumstances, persuade the jury that the defendant was a member of the drug conspiracy in furtherance of which the killing was committed.").

While, following certain evidentiary rulings, no trial evidence showed Jordan with narcotics or newfound wealth immediately after Mizell's murder, such evidence was unnecessary because there was already evidence that Jordan agreed to be part of the narcotics conspiracy to sell cocaine and had already done so. *See United States v. Pierce*, 785 F.3d 832, 839 (2d Cir. 2015) ("Section 848(e)(1)(A) liability does not require active involvement in drug distribution.").

The district court also differentiated the timing between the murder and the impetus for the murder in *Campbell* from this case. In *Campbell*, the murder occurred two weeks after the victim's attempted robbery of the stash house; here, the murder was two months after the failed Baltimore deal. (SPA:69-70). But the court did not address the evidence explaining Mizell's whereabouts outside of New York during

that time, and, importantly, the evidence that Washington believed Mizell was meeting with the cocaine supplier's associate on October 29 or 30 and that Mizell returned from the Midwest on October 29, supporting the reasonable inference that they planned to murder Mizell after he met with his drug supplier.

The district court also discounted Jordan and Washington's meeting after the murder because they met one month after the murder, as opposed to hours after like in *Campbell*.[14] (SPA:70). In *Campbell*, the three defendants fled to Peter's apartment, left that apartment with Peter carrying a bag containing essential items for the drug operation, and drove to the hospital in a van driven by a cooperating witness because Peter had been shot during the murder. Here, there was no

---

[14] The district court also accused the government of "fail[ing] to state...that this meeting occurred over a month after Mizell's murder." (SPA:70). But the government explained the timing in its opposition brief, and it provided that timing again on December 16, 2025, when the court asked for a record citation about that meeting. (*See* DE:296 at 11 ("McDonald also testified that about one month after the murder, Washington said he 'had to go meet up with Noid [Jordan]' after the murder and returned 'upset.'"), 320 (citing to the same record and GX 624 as a hotel receipt for that meeting on December 7, 2002)). The court's decision fails to account for this part of the record.

evidence of such an injury to either Jordan or Washington and therefore no need to meet immediately after the murder. Instead, Washington stopped living at Mizell's family home and stayed in hotels with McDonald, which is where he lived when he met Jordan one month later. (A:497). At minimum, the evidence indicates that Jordan's delayed meeting with Washington was designed to avoid suspicion. And the jury could have also considered evidence that Jordan and his father engaged in witness intimidation during that time to tie off loose ends.

The district court made similar errors when describing *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), in which the defendant murdered his co-conspirator for failing to give him a share of drugs the co-conspirator had robbed from a drug dealer. This Court held the evidence was sufficient to establish the defendant had a narcotics-related motive despite the "holes in the Government's proof of motive." *Id.* at 65. It explained there was no evidence of an agreement to share the stolen drugs with the defendant nor any disagreement by the defendant regarding the division of the stolen drugs. *Id.* "Nevertheless," this Court stated, "the evidence presented was sufficient so that a rational jury could find that [the defendant] had a motive to kill [the victim]." *Id.* The

evidence, "which was entirely circumstantial," was that: (1) the defendant suggested to the murder victim that he could likely rob the drug dealer, (2) the victim robbed the dealer of his drugs and a car at gunpoint, (3) the robbed dealer told several people he had been robbed of sixteen ounces, (4) the victim told the defendant twice he had stolen only four ounces and ultimately gave him two quarter ounces, (5) the defendant searched the car from which the drugs were stolen and did not find additional drugs, (6) the defendant notified a co-conspirator that he wanted to talk to the victim, (7) two hours later, the victim was dead, and (8) a witness saw the defendant with a bulge at his waist after the murder. *Id.* at 61-62, 65.

The district court held that *Glenn* was not comparable because this evidence showed the defendant had a narcotics motive since the victim "lied about the robbery proceeds, and the defendant's portion of drugs was 'unacceptably small,'" whereas here, there was "simply no evidence suggesting that Jordan felt cheated by the failure of the Baltimore deal, was disappointed by the proceeds he received from the conspiracy, or sought to steal cocaine from Mizell, much less motivated to kill Mizell because of these reasons." (SPA:68-69). But, in *Glenn*, there

was no direct evidence the defendant knew that the victim lied or that the defendant felt aggrieved by the amount of drugs he had received. *See* 312 F.3d at 61-62, 65. The jury there could infer that motive based on evidence that the defendant received conflicting accounts regarding the quantity of drugs stolen and then wanted to talk to the victim. Here, the jury could similarly infer that Jordan, like Washington, was aggrieved by the failure of the lucrative deal with Yakim, given his subsequent murder of Mizell. In that deal, Jordan was promised—unlike the defendant in *Glenn*—a distribution role. Even more, Jordan committed that murder on the same day, or day after, Mizell was to meet with an associate of the cocaine supplier. Unlike in *Glenn*, there was no evidence here that permitted the inference that anyone else had a motive to kill Mizell—or that Jordan's motive could have been anything other than related to the narcotics conspiracy.

The district court also rejected the government's reliance on *United States v. Vernace*, 811 F.3d 609 (2d Cir. 2016), but its analysis misread the facts in *Vernace*. The court stated that in *Vernace*, "the defendant felt disrespected as a result of a personal dispute," whereas here, there was "no evidence of a personal dispute between Jordan and

Mizell." (SPA:71). But Vernace was not the person who felt disrespected; it was Vernace's fellow Gambino associate, Riccardi, and the government never argued that Vernace had felt disrespected. *Vernace*, 811 F.3d at 616 ("During his interactions at the Shamrock Bar, Riccardi suffered an affront (real or perceived) to himself and to his authority as a Gambino associate, and, by extension, to the family. Vernace, in turn, helped him address the affront. That is, a reasonable jury could have concluded Vernace went so far as to commit murder in a crowded bar because such a public display related to preserving (and even enhancing) the reputation of the Gambino crime family and its members.").

Here, the evidence revealed that the Baltimore deal failed due to Yakim's animosity with Washington. It was reasonable, based on Jordan and Washington's role in the narcotics conspiracy, their close conspiratorial relationship, and their involvement in the murder, to infer that Jordan "helped [Washington] address the affront," as Vernace helped Riccardi. *Id.* In fact, this Court found the fact that Vernace was uninvolved and not present during the dispute at the bar necessarily meant that "the spilled drink was not entirely personal," which meant there could have been no reason for Vernace's involvement other than to

assist a fellow Gambino member, which satisfied the nexus between the murder and the racketeering enterprise. *Id.* at 617.

Simply put, the district court ignored this Court's reminder that seemingly innocent acts taken individually may indicate complicity when viewed collectively. It refused, despite this considerable evidence, to draw the inferences that Jordan knew about the failed deal and blamed Mizell for not receiving the payout he was promised, or that Washington told Jordan about Mizell's plans to meet with the cocaine supplier in October and Jordan wanted to exploit that opportunity for him and Washington. Here, the jurors were entitled to rely on their common sense and experience in drawing inferences of Jordan's knowledge and his criminal intent.

### D. The Jury Was Not Required to Be Unanimous on Which Narcotics-Related Motive Applied or How Jordan Believed the Firearm Would Further the Conspiracy

"[A] federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999).

Count One required proof of a drug-related motive for the murder, but the jury was not required to be unanimous on which drug-related motive applied to the murder, or whether Jordan and Washington had the same narcotics-related motive. Unanimity as to the particular narcotics-related motive is not required because a narcotics-related motive is not an element of Section 848(e)(1)(A). Rather, it is one means of satisfying the "substantive connection" requirement of the "engaging in" element of Section 848(e). *See Aguilar*, 585 F.3d at 660 ("Proof of a Drug-Related Motive Is Sufficient, But Not Necessary, To Satisfy the 'Substantive Connection' Requirement"). This Court explained that "[n]either *Desinor* nor *Santos* [] ruled that only proof of a drug-related motive could satisfy this [substantive connection] requirement" of Section 848(e). *Id.* at 660. *Aguilar* thus confirmed that how the substantive connection requirement is satisfied is a question of means.

In support of its conclusion that the evidence did not prove a narcotics-related motive that applied to Jordan, the district court noted that "tellingly, at trial, the Government did not argue expressly the existence of any of these three motives" that were proposed in the

government's opposition brief. (SPA:65). But the government was not required to do so.

Indeed, the government did not cabin Jordan's intent to one specific motive, instead telling the jury that "whatever the specific motive may have been, it doesn't matter" because they were "all related to the drug conspiracy" and therefore "sufficient under the law." (A:643-44).[15] The government intentionally did not limit the evidence to specific motives before the jury because the evidence permitted several narcotics-related motives for the jury to find. The government was not required to prove which of the possible narcotics-related motives was the motive behind the murder. *See Desinor*, 525 F.3d at 202 ("[T]he government need only prove beyond a reasonable doubt that *one* motive for the killing (or conspiracy to kill) was related to the drug conspiracy. The existence of other motives does not affect the government's ability to satisfy the 'engaging in' element."); *Aguilar*, 585 F.3d at 660 ("a single drug-related motive for a killing, even among many non-drug-related motives"

[15] The government added: "Certainly, a cocaine deal worth hundreds of thousands of dollars with the promise of more to come is enough to get someone killed." (A:644).

satisfies Section 848(e)). So long as the jury was unanimous that the trial evidence satisfied the "substantive connection" requirement of the "engaging in" element of Section 848(e), it did not need to be unanimous as to which means (*i.e.*, which drug-related motive) satisfied that element.

Similarly, the jury was not required to unanimously find how each defendant believed the firearm, which was used to murder Mizell, would further the conspiracy in Count Two. Section 924(j)(1) requires that the use of the firearm be "during and in relation to" the commission of the underlying narcotics conspiracy, which is satisfied by evidence that the defendant used the firearm in a manner calculated to further the narcotics conspiracy. *United States v. Wallace*, 447 F.3d 184, 186-87 (2d Cir. 2006); *see Finley*, 245 F.3d at 203 ("[T]he requirement in § 924(c)(1) that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation [at issue]."). Here, the evidence could have permitted some jurors to believe that Jordan murdered Mizell to punish him, while others may have thought Jordan wanted to steal the remaining cocaine on consignment to sell it, given his desire to be "put on" and questioning of

James as to pricing. The jury needed only to unanimously find that Jordan's use of the firearm to murder Mizell was at least in part to further the narcotics conspiracy.

That the evidence permitted several narcotics-related motives—all of which were interrelated here and provided proof of furtherance of the conspiracy—does not cast the government's evidence into doubt. *See Richardson*, 526 U.S. at 817 ("disagreement about means" among the jurors as to whether the defendant used a gun or a knife "would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force"); *Aller v. United States*, 646 F. App'x 21, 23 (2d Cir. 2016) (unanimity not required as to which motive applied because motive did not represent an element of the crime of murder in-aid-of racketeering under 18 U.S.C. § 1959(a)).

Significantly, the district court read the case law too narrowly to suggest that Jordan himself must have a narcotics-related motive separate from Washington's. Rather, precedent instructs that there can also be "a" narcotics-related motive for the murder that both co-conspirators worked to achieve. As a matter of law, it is sufficient to meet

the substantive nexus if one motive for the murder was because (1) Washington felt aggrieved by Mizell's inability to close the lucrative Baltimore deal with Yakim, or (2) Washington's concerns about exclusion from the narcotics conspiracy were confirmed when Mizell sent him away on October 30, or (3) Washington wanted to steal what he believed was cocaine or money Mizell had in his possession after he met with the cocaine supplier's associate on October 29 or 30—and Jordan knew that motive and shot Mizell as part of that plan. *See Santos*, 541 F.3d at 74-75 (defendant hired to murder two people based on drug dealer's desire for retaliation was properly convicted); *United States v. Walker*, 142 F.3d 103, 113-14 (2d Cir. 1998) (conviction of two defendants based on their co-conspirator's motive to rob the victim who he believed had drugs and money).

### E. The Trial Evidence Permitted Several Possible Narcotics-Related Motives for Jordan's Murder of Mizell, All of Which Had the Potential to Further the Narcotics Conspiracy

Based on the trial evidence, the jury could find that at least one motive for Jordan's murder of Mizell was related to the narcotics conspiracy, and that Jordan's use of the firearm was intended to further the narcotics conspiracy.

If Washington's own motives for killing Mizell stemmed from Mizell's failure to convince Yakim to accept the lucrative deal, or from Mizell seemingly excluding Washington from his plans for the narcotics conspiracy, Jordan can be convicted of violating Count One, so long as Jordan knew of that motive and committed the murder. Under this theory, the jury reasonably concluded that Washington wanted to kill Mizell in connection with the narcotics conspiracy, and that he convinced Jordan to do it. *See, e.g.*, *United States v. Kemp*, No. 21-1684-CR, 2023 WL 405763, at *3 (2d Cir. Jan. 26, 2023) (summary order) (Polanco murdered victim drug dealer at Gonzalez's direction because victim was a rival to Gonzalez, even if Polanco's own motive was personal); *United States v. Arrington*, 941 F.3d 24, 37 (2d Cir. 2019) ("[A] reasonable jury could have found that [defendant's] role and offers to serve as 'muscle' assisted his co-conspirators' drug trafficking activities."); *Pierce*, 785 F.3d at 839 ("That [the defendant] did not participate in the narcotics conspiracy in some way other than carrying out the murders does not undermine the sufficiency of the evidence that he was a co-conspirator."); *United States v. Gadsden*, 300 F. App'x 108, 110 (2d Cir. 2008) ("[T]estimony about violent acts and firearm possession during or around

the time of a narcotics conspiracy appropriately establishe[s] [a co-conspirator's] conduct during the charged conspiracy."). The murder and its advance planning, coupled with Jordan and Washington's relationship, Washington's questioning of Mizell, and Washington's subsequent phone call, allowed the jury to conclude that Washington secured Jordan's participation through the narcotics conspiracy rather than over the competing inference that Jordan committed such murder for a personal reason (of which there was no evidence), or no reason at all. *See Vernace*, 811 F.3d at 616 ("Vernace's theory carries with it an air of implausibility. A jury need not credit a theory that is not supported 'by reason and common sense.'").

Yet, there was ample evidence that permitted Jordan to have his own narcotics-related motive. Even though Jordan did not travel with Mizell and Washington to Baltimore, Jordan, like Washington, lost a money-making opportunity when Yakim rejected Mizell's distribution plan for Baltimore. Moreover, like Washington, Jordan could have thought that Mizell was cutting Jordan out of other deals to sell the cocaine and keep the profit for himself. If it was logical for the jury to conclude that this supplied a sufficient narcotics-related motive for

Washington, it is difficult to see how it would not also be sufficient for Jordan.

There was also evidence that supported the conclusion that the defendants murdered Mizell due to the belief that Mizell was in possession of cocaine or drug-related money on October 30. There was evidence that Jordan and Washington planned the murder in advance, and for when Washington believed Mizell was meeting with Unc's associate. There was evidence about how delivery and payment of drugs on consignment works and the potential profits from cocaine sales, and that the day before the murder, Mizell told Watford, who lived at his family home with Washington, to see his accountant, suggesting that Mizell believed he was coming into money. There was evidence that Jordan was interested in expanding his cocaine sales outside of New York when he asked James, who was from Wisconsin, about the prices of cocaine and begged for Mizell to "put [him] on." (A:533). The murder occurred shortly after Washington asked Mizell questions about their upcoming plans for the narcotics conspiracy and Jordan arrived.

The same evidence could also have led the jury to reasonably infer that the defendants killed Mizell to benefit themselves in the

conspiracy. *United States v. Heinemann*, 801 F.2d 86, 92 (2d Cir. 1986) ("It is not inconsistent with such an ongoing, unitary conspiracy that disputes might arise...and that switches in affiliation might occur from time to time."). Additionally, there was testimony that Washington knew Unc prior to the August meeting in D.C., and, that, before that meeting, Washington advised Mizell about cocaine pricing in different cities and recommended the price point for the 10 kilograms to which Mizell had agreed, but Mizell left Washington behind in the car when Mizell met with Unc to obtain the cocaine. There was evidence that Washington asked Mizell about the plans for the narcotics conspiracy, even though Washington had already prepared to murder Mizell by then, implying he was seeking information about the conspiracy. There was similar evidence that permitted the inference that Jordan held resentment against Mizell related to his role in the narcotics conspiracy. After all, Jordan had successfully sold his test-run of cocaine and was eager to sell, but Mizell took Washington (who had "messed" up selling his sample), and not Jordan, to Baltimore and on a separate trip to Manhattan where Mizell and Washington discussed the narcotics conspiracy. (A:394-98). And Mizell was unsuccessful in securing the lucrative deal with Yakim.

Jordan admitted two years after the murder that he would "kill [Mizell] again," indicating lasting resentment. (A:584). Drawing all inferences in the government's favor, the jury could have concluded that the defendants murdered Mizell to further their role in the narcotics conspiracy. *See Walker*, 142 F.3d at 114 (rejecting claim of "personal vengeance contrary to the interests of the conspiracy" because robbery and subsequent murder would "strengthen[] the aggressor's position in the local drug trade"). That motive was reasonable, even if Jordan and Washington's belief that they could succeed in the narcotics conspiracy with Unc and without Mizell was not. *See Smith*, 508 U.S. at 238 (stating the firearm under Section 924(c) "at least must facilitate, or have the *potential* of facilitating, the drug trafficking offense") (emphasis added).

As explained above, the government did not need to prove precisely why Jordan was dissatisfied with Mizell, so long as the evidence could permit the reasonable inference that at least one motive for the murder was related to the narcotics conspiracy. The jury was not required to be unanimous on which narcotics-related motive applied to the murder, or that only one applied to the murder, or that the defendants held the same motive.

The evidence does not permit any innocuous competing inference for Jordan's motive for the murder, which was committed with his narcotics co-conspirator. As the district court acknowledged, there was "no evidence of a personal dispute between Jordan and Mizell." (SPA:71). Nor was there any evidence of others who had an equally compelling motive to kill Mizell, as there was in *Glenn* (which led this Court to reverse his conviction). *Glenn*, 312 F.3d at 65. Here, none of the witnesses testified about Mizell harboring animosity towards them or others or about anyone harboring animosity towards Mizell. Instead, numerous witnesses testified about Mizell's generosity with his money and success. (A:184, 218, 237-39, 341-42). Unc also forgave Mizell's outstanding debt when he was killed.

Similarly, it is sufficient for a conviction under Section 924(j) that Jordan thought murdering Mizell would benefit him in the narcotics conspiracy, or the conspiracy itself, in some way. The same evidence outlined above provided a sufficient basis for the jury to rationally find that Jordan used a firearm during and in relation to the narcotics conspiracy at the time of Mizell's murder. All of the motives previously described "afforded some advantage (actual or potential, real or

contingent)" to the narcotics conspiracy—by punishing the co-conspirator who did not complete the promised deal with Yakim, or by killing the co-conspirator to steal narcotics-related money or the cocaine on consignment for the defendants to distribute themselves. *Snow*, 462 F.3d at 62; *see United States v. Lewis*, 62 F.4th 733, 745-46 (2d Cir. 2023); *see also Vernace*, 811 F.3d at 616 (murder that furthers own reputation can enable one "to more effectively carry out the activities of the [organization]"). The jury need not be unanimous on how the use of the firearms furthered the narcotics conspiracy so long as it found that it did. Nor does it matter that Mizell was a member of the same conspiracy if Jordan thought his removal would benefit the conspiracy in some way. *See Glenn*, 312 F.3d at 65.

In sum, the district court's view of the record ignored the evidence at trial and the reasonable inferences to be drawn therefrom. "Nor are the interpretations and inferences urged by the government so speculative as to preclude adoption by a reasonable jury familiar with the totality of the evidence. Indeed, the inferences are entirely consistent with the totality of the evidence[.]" *United States v. Coppola*, 671 F.3d 220, 239 (2d Cir. 2012). Jordan was "free to argue—and in fact did

argue—alternative inferences" to the jury in summation, but this Court "cannot conclude that a reasonable jury was compelled as a matter of law to adopt [his] arguments." *Id.*[16]

## III. The District Court Erred When It Failed to Consider Aiding and Abetting Liability

The district court also erred in failing to address the jury's alternative basis for guilt against Jordan—aiding and abetting liability—

---

[16] Without saying so, the district court applied the "equipoise" rule to review the evidence as to Jordan (it disavowed it was doing so as to Washington. (SPA:41). That theory, which has been severely limited by this Court, "appl[ies] only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *United States v. Aquart*, 912 F.3d 1, 45 (2d Cir. 2018). Accordingly, the equipoise rule and "[t]he possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to [a] sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *MacPherson*, 424 F.3d at 190. The equipoise rule is inapplicable here because the evidence was neither "nonexistent" nor "so meager as to preclude the inference necessary to a finding favorable to the government." *United States v. White*, 7 F.4th 90, 102-03 (2d Cir. 2021). Even if the equipoise rule applied, the district court did not—and could not—draw any inferences consistent with innocence given the evidence of Jordan shooting Mizell; it stated only that the evidence did not permit a narcotics-related motive. Tellingly, the court never identified a possible reason for why Jordan would have participated in murdering Mizell alongside Washington other than something related to their drug trafficking operation. (SPA:71 (admitting "there is simply no evidence of a personal dispute between Jordan and Mizell")).

that had been charged in the Indictment, briefed by the government, and on which the court had instructed the jury. Aiding and abetting liability provided an additional basis to maintain Jordan's convictions on Counts One and Two.

Aiding and abetting liability requires the government to prove that "[the defendant] willfully and knowingly associate[d] himself in some way with the crime, and [sought] by some act to help make the crime succeed." *United States v. Prado*, 815 F.3d 93, 100 (2d Cir. 2016); *see Rosemond v. United States*, 572 U.S. 65, 76 (2014) ("[A] person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission."). A "defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense." *Rosemond*, 572 U.S. at 73. There is "no authority for demanding that an affirmative act go toward an element considered peculiarly significant; rather, as just noted, courts have never thought relevant the importance of the aid rendered." *Id.* at 75. In terms of intent, the evidence must show the defendant had "at least the degree of criminal intent necessary for the substantive offense itself, but was not required to show that he knew all of the details...so

long as he knew its general nature and extent." *United States v. Archer*, 977 F.3d 181, 190 (2d Cir. 2020); *Rosemond*, 572 U.S. at 78 (aiding and abetting liability for Section 924(c) requires a "defendant's knowledge of a firearm must be advance knowledge…that enables him to make the relevant legal (and indeed, moral) choice").

Jordan was charged in Counts One and Two with aiding and abetting liability. (A:48-49). The district court accordingly instructed the jury about using aiding and abetting liability to convict either defendant of Counts One and Two. (A:658-59, 667-69, 672-76).

Count One provides aiding and abetting liability for "any person...who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual" and "such killing results." 21 U.S.C. § 848(e)(1)(A); *Walker*, 142 F.3d at 113-14. Therefore, even though Washington was not the shooter, he can be found guilty of a substantive violation of Count One based on his role in the murder. Specifically, if Washington caused the killing, due to his narcotics-related motive, his procurement of .40 caliber ammunition and a firearm, and his inducement of Jordan to shoot Mizell, that evidence permits him to be held accountable as a principal under Count One.

Jordan aided and abetted Washington's commission of the offense by doing "some act to help make the crime succeed," which, at a minimum, was by shooting Mizell in the head. *Prado*, 815 F.3d at 100.

The government was required to show that Jordan had the criminal intent to murder Mizell, but not that he knew Washington's narcotics-related motive for doing so. If it were otherwise, and Jordan were required to share the narcotics-related motive, aiding and abetting liability under Section 848(e)(1)(A) would be subsumed into the substantive offense. *See, e.g.*, *Santos*, 541 F.3d at 66 (hired henchman liable as principal). The objective of Section 848(e)(1)(A) is that the killing results; a narcotics conspiracy is one way to satisfy the substantive connection, but the objective of the narcotics conspiracy is not the objective of Section 848(e)(1)(A). *See Walker*, 142 F.3d at 113-14; *see also United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004) (holding that conviction for aiding and abetting depends on defendant's "specific intent of facilitating or advancing the principal's commission of the underlying crime").

Under this theory of liability, Washington wanted to kill Mizell in connection with the narcotics conspiracy, and he recruited

Jordan to do it. The evidence revealed that "[Jordan] knew that [Mizell] would be killed in the confrontation, that he aided in preparations for the murder, and that he accompanied [Washington] to [Mizell's Studio] with the shared intent of carrying out the killing." *Walker*, 142 F.3d at 114. Jordan did not need to know Washington's reason for the murder. *United States v. Heras*, 609 F.3d 101, 108 (2d Cir. 2010) ("[A] defendant need not know all the details of a criminal scheme to be guilty of…aiding and abetting.").

Nonetheless, even under a narrower interpretation that Jordan was required to know Washington had some motive related to narcotics for the murder even if he did not know the exact reason, or, further, was required to know Washington's specific narcotics-related motive, Jordan's role as a co-conspirator in the narcotics conspiracy and the evidence discussed herein, coupled with his affirmative act of shooting Mizell, provided ample evidence to convict him of Count One as an aider and abettor. *See United States v. Abozid*, 257 F.3d 191, 199-200 (2d Cir. 2001) ("Here, the jury convicted appellant of the crime itself. It could hardly have reached that conclusion and have left any possibility that it would have acquitted appellant of aiding and abetting the crime.

There is no element of aiding and abetting the crime that was not found by the jury."); *United States v. Peterson*, 768 F.2d 64, 67 (2d Cir. 1985) (conviction valid "even if some jurors believed that [the defendant] and the other jurors believed that [the co-defendant] was the aider or abettor").

Jordan can be held liable as an aider and abettor under Section 924(j) for the same reasons, even as the shooter. In *United States v. Caraballo*, No. 12-CR-105, 2014 WL 3535348, at *6, 8-10 (D. Vt. July 16, 2014), there was conflicting testimony as to whether the defendant discharged the firearm that killed the victim or his co-conspirator shot the victim at the defendant's direction. The jury credited the latter theory, and indicated on the verdict form that it found the defendant caused the death of the victim, but that he did not discharge the firearm, which still permitted a conviction as principal under Section 924(j) in connection with the defendant's "us[ing], carr[ying] a firearm...or possess[ing] a firearm." *Id.* at *1-2; 18 U.S.C. § 924(c)(1)(A). This Court affirmed the defendant's conviction as a principal under Section 924(j), even though he was not the shooter. *United States v. Caraballo*, 658 F. App'x 595, 597 (2d Cir. 2016). Here, Washington

gathered ammunition and a firearm and pointed his firearm at High to block her from escaping the Studio to seek help. If Washington wanted Mizell dead to further the narcotics conspiracy, as the evidence demonstrated, then Jordan can be found guilty as aiding and abetting Washington, even if he was the person who shot Mizell.

## CONCLUSION

For the reasons stated above, this Court should reverse the district court's judgment of acquittal on Counts One and Two and reinstate the jury's guilty verdict against Jordan.

Dated: Brooklyn, New York
April 16, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*.

By: /s/ MIRANDA GONZALEZ
MARK E. MISOREK
MIRANDA GONZALEZ
Assistant U.S. Attorneys

AMY BUSA,
MARK E. MISOREK,
MIRANDA GONZALEZ,
*Assistant United States Attorneys*,
(*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), Second Circuit Rule 32.1(a)(4), and this Court's order of April 8, 2026, permitting the filing of an oversized brief of no more than 20,000 words because the brief contains 18,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: Brooklyn, New York
April 16, 2026

/s/ AMY BUSA
AMY BUSA
Assistant U.S. Attorney